**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**NORTH AMERICAN RESEARCH AND DEVELOPMENT CORP. et al., Defendants.**

**No. 67 Civ. 3724.**

United States District Court
S. D. New York.

Feb. 8, 1968.

Mahlon M. Frankhauser, Regional Administrator, Charles Snow, Assistant Regional Administrator, John J. Phelan, III, New York City, for plaintiff Securities and Exchange Commission New York Regional Office.

Glass & Greenberg, New York City, for North American Research and Development Corp., Edward White, Lewis Dillman and K. Ralph Bowman.

Arnold & Porter, Washington, D. C., for North American Research and Development Corp.

Saul Horing, New York City, for Donald Glenn, Norma C. Bowman, Ramon N. Bowman, Albert W. Conrad, Richard E. Whitney, Frank M. Whitney, Abby Whitney and Robert A. Johnson.

Robert W. Taylor, New York City, for Wellington Hunter, d/b/a Wellington Hunter Associates.

Feiner & Klaris, New York City, for Dunhill Securities Corp. and Guido Volante.

Gottlieb & Schiff, Esqs., New York City, and Donald Van Koughnet, Silver Springs, Md. for Lars Hagglof & Co., Ltd., Sidney Rosen and Redroof Trading Co.

Henry Malon, New York City, for Alfred Blumberg.

Colton & Pinkam, New York City, for Martin Orenzoff.

Harry Pollak, New York City, for Griffith C. Lindquist, d/b/a Lindquist Securities Co.

MANSFIELD, District Judge.

Acting pursuant to § 20(b) of the Securities Act of 1933 (15 U.S.C.A. § 77t (b)) and § 21(e) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78u (e)), the Securities and Exchange Commission ("SEC" herein) seeks to enjoin North American Research and Development Corporation ("North American" herein) and 42 other defendants from committing further violations of the registration and anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, and the rules and regulations thereunder. However, as a result of default judgments, consents to the entry of preliminary injunctions, and failure to serve some of the named defendants, this decision on the SEC's motion for a preliminary injunction is confined to the remaining 21 defendants.[1]

On this motion, hearings were held over a period of seven days to resolve issues raised by the parties' affidavits, at which oral testimony of 24 witnesses was received, and this decision is based not only upon affidavit proof submitted by the parties but, where facts were disputed, upon the Court's observation and careful appraisal of the witnesses who testified with respect to disputed issues.

The central figure in the financial saga leading to the SEC's application is the defendant Edward White, who was the principal originator of, and driving force behind, a scheme to acquire control of the issued stock of an inactive publicly-held corporation, North American (formerly named Utah Fortuna Gold Company) and, with the defendants Sam Freeman and Frank M. Naft, to promote dis-

---

1. North American Research and Development Corp., Edward White, Robert A. Johnson, Lewis Dillman, Donald Glenn, K. Ralph Bowman, Norma C. Bowman, Ramon N. Bowman, Albert W. Conrad, Wellington Hunter, d/b/a Wellington Hunter Associates, Dunhill Securities Corp., Guido Volante, Lars Hagglof & Co., Ltd., Alfred Blumberg, Richard E. Whitney, Frank M. Whitney, Abby Whitney, Martin Orenzoff, Sidney Rosen, Redroof Trading Co., Ltd., and Griffith C. Lindquist, d/b/a Lindquist Securities Co.

tribution of the balance of the issued stock with a view to introducing it onto the over-the-counter market in the United States, creating a demand for it, instigating the trading of it, and running up its market price, all for the benefit of himself and a group of friends engaged in distributing it. A 52-year old, self-styled promoter and securities trader who has in recent years dealt principally in Canadian mining securities, White, at the times here involved, maintained residences in New York and Toronto, where he also operated an office and had eight brokerage accounts in Canada, and three accounts in the United States. His success in earlier promotions had given him a substantial following among friends in both countries. Prior to his becoming heavily involved in the mining business, both as an officer of mining corporations and a person engaged in developing exploration of mining claims, White had been associated as a registered representative with Hilton Securities Corporation, a New York broker-dealer.

In March, 1967, White let it be known among some of his friends that he wanted to acquire a corporate "shell", i. e., a publicly-held, inactive corporation having neither assets nor liabilities. His immediate plan was to place some Canadian mining claims in the shell and then promote market interest in the stock of the corporation itself. Although he testified that he desired control of a publicly-held corporation rather than of a closed or privately-held one because he wished to develop liquidity for his estate and to avoid underwriting expenses, the Court, on the basis of all of the proof before it, including testimony of various other witnesses conflicting with that given by White, finds that from the outset his purpose and that of his immediate friends was to acquire and distribute the balance of the shares of the shell (other than those directly acquired by him), to promote trading in the stock, and to increase the over-the-counter price of such shares on the basis of his prospective development of the company, with a view to their making an interim profit on the purchase and resale of such shares and White's eventually being in a position to realize a profit on his acquisition.[2]

On April 27, 1967 White acquired control of such a worthless corporate shell, a Utah company called Utah Fortuna Gold Company, the name of which was later changed by him to North American. Although no market for its stock had existed for years, within three months, as the result of a carefully laid and executed plan of the White-Freeman-Naft trio, approximately 200,000 shares of its stock was distributed via Canadian accounts to broker-dealers and the public in the United States, trading of the stock was initiated on the over-the-counter market, and the price of the stock, as a result of the group's skillful promotion, was run up during the same short period from $\frac{1}{2}$ cent per share over-the-counter to more than $6.00 per share, or more than 1200%, even though the corporation did not carry on any commercial operations during the period and its assets were of doubtful value. On July 20, 1967, the bubble burst when trading in the shares was suspended by the SEC. The underlying facts found by the Court are as follows:

Following White's advising his friends in March, 1967, of his interest in acquiring a publicly-owned shell, Sam Freeman, a Toronto stock trader,[3] who had been a

2. White himself admitted that one reason for wanting control of publicly-owned shell was to facilitate his underwriting of Canadian mining claims in the United States, stating "It is very difficult to underwrite Canadian mining claims down here" (Tr. 991), and "I think it would be impossible to get them [broker-dealer underwriters] to underwrite Canadian mining stocks in the United States" (Tr. 1005).

3. On August 19, 1959 the SEC had denied a broker-dealer registration to Freeman's firm, Freeman Securities Corp., of which he was president and director, because of wilfully made false statements in its application with respect to ownership of its shares and misstatements regarding its assets and financial condition.

close friend of White for 15 or 20 years, located such a company through an acquaintance, the defendant K. Ralph Bowman, of Salt Lake City, Utah. Bowman had been engaged in the securities business with a family broker-dealer firm, Ned J. Bowman Corporation, and later with the broker-dealer firm of Jonathan & Co., Inc., and has repeatedly been enjoined from violating §§ 5 and 17 of the Securities Act of 1933, the last injunction having been entered by the United States District Court for the District of Utah on January 26, 1965, in connection with Bowman's sale of stock of Thermal Dynamics Corp.[4] ("Thermal" herein), a company that had been engaged in 1964 in the construction and development of a pilot plant in Helper, Utah, for testing of a process for manufacture of coke that might be burned without air pollution. Thermal was later to play a major role in the activities of White and his group in promoting the distribution and trading of stock of North America (Utah Fortuna), the corporate shell acquired through Bowman.

Upon receiving Freeman's inquiry, Bowman, through a Salt Lake City friend and associate in the Thermal venture, one Richard Whitney[5] ("Whitney" herein) and Whitney's friend Donald Glenn, also of Salt Lake City, was put in touch with one Robert A. Johnson of Salt Lake City, secretary-treasurer, director and transfer agent of an inactive, publicly-owned Utah corporation named Utah Fortuna Gold Company (later named North American). Utah Fortuna had been incorporated in January 1933. During 1964 the assets of the corporation were sold and proceeds distributed, leaving it a worthless, inactive, empty shell, with neither assets nor liabilities. In March, 1967, when Whitney met Johnson, Utah Fortuna had approximately 50 stockholders (Tr. 1082), largest of which was South Utah Mines ("South Utah" herein), another Utah corporation, the owner of 1.2 million of its 1.8 million outstanding shares. South Utah and Utah Fortuna were under the common control of Mrs. Mabel McGarry (who owned between 70% and 80% of the South Utah stock). Mrs. McGarry, Johnson and one Florence Williams were the officers and directors of both companies, and Johnson was the transfer agent for both.

Upon learning from Whitney of Freeman's interest (on behalf of his client White) in acquiring control of the shell and his willingness to pay $10,000 for it, Johnson advised that a sale of control could be arranged. Thereupon he informed Mrs. McGarry, president of South Utah, of the possibility of selling control and obtained from her authority to sell the 1.2 million Utah Fortuna shares owned by South Utah, or 66% of Utah Fortuna's outstanding stock at a price between $500 and $1,000.

Armed with authority to sell control of Utah Fortuna (North American), Johnson notified Whitney that he would provide him with an option for the 1.2 million Utah Fortuna (North American) shares, which represented control. It was agreed that 1 million shares, representing control, would be offered by Whitney to Freeman's client (White) for $10,000, and that if the sale was consummated, the proceeds would be distributed

---

4. In addition to his prior acquaintanceship with Freeman, Bowman had been acquainted for three years with defendant Frank M. Naft of Toronto, a member of the Toronto triumvirate of White, Freeman and Naft, which conceived, hatched, and carried out the scheme for distribution of North American shares, which is the subject of the present application.

5. Like Bowman, Whitney had also had his troubles with the SEC. With his brother Frank Whitney, he had been engaged in the securities business as Whitney & Co., a broker-dealer registered with the Commission. On November 6, 1963, the Commission revoked its registration, finding that it had violated §§ 5 and 17(a) of the Securities Act in connection with the sale of mining stocks.

as follows: after Mrs. McGarry and South Utah were paid $1,000, the remainder of the fund, comprising $9,000 plus 200,000 shares, was to be divided:

| | |
|---|---|
| Bowman | $3,875.00 |
| Whitney | 2,501.25 |
| Johnson | 1,501.25 |
| Glenn | 1,501.25 plus 100,000 shares |
| Frank Whitney, Richard Whitney's brother | 1,501.25 plus 100,000 shares |

——◆——

In implementation of the foregoing arrangements, Johnson, on April 20, 1967, executed a written "10-day option" from South Utah to Whitney, given without any immediate payment, to purchase 1.2 million Utah Fortuna (North American) shares at $4,750 (P's Ex. 2),[6] and on April 26, 1967, South Utah's Board of Directors passed a resolution authorizing Johnson to sell its stock to Whitney.

Upon learning of the availability of the shell Freeman advised White. Thereupon White confirmed his interest by telephone to Bowman, and on April 26, 1967, White, together with another Toronto friend, Frank M. Naft[7] and an attorney, Stanley Kanarek,[8] flew to Salt Lake City, where on April 27, 1967, Whitney, as "Seller", entered into an agreement with White and one Sonia Starr for the sale of 1 million shares of Utah Fortuna for $10,000.[9] These shares have not been subsequently redistributed to the public.

In the meantime beginning on April 24, 1967, Whitney, Johnson and Bowman began a program of acquiring most of the remaining Utah shares outstanding (over and above the 1.2 million shares that were the subject of the option to Whitney) for sale to two firms in Toronto designated by White and Freeman. Freeman advised Bowman by telephone from Toronto that any shares acquired by him would be purchased by the firm of J. P. Cannon & Co., Ltd. of Toronto, Canada, and White told Whitney that if he was able to buy any stock he should call J. P. Cannon & Co. or Lars Hagglof

6. Although no payment was made for the option, Johnson testified that he considered South Utah obligated to deliver the shares upon payment of $4,750, and in view of Mrs. McGarry's willingness to sell the shares for a much lower price, i. e., from $500 to $1,000, he had no reason to revoke or cancel.

7. Naft, like Freeman, Bowman and Whitney, had a history of violations of the Securities Acts. On June 26, 1957, he consented to the entry of a permanent injunction in SEC v. Birnbaum, et al. (S. D.N.Y.) against violation of §§ 5(a) and 5(c) of the Securities Act. Later he was named in numerous state court orders to cease and desist violating Blue Sky laws. He had been enjoined by the New York Supreme Court in an action by that state's Attorney General and was named as the cause for the SEC's revocation of another broker-dealer registration.

8. On May 4, 1966, Kanarek pleaded guilty to an indictment filed in the Eastern District of New York charging him with stock fraud.

9. Sonia Starr was a Toronto friend of White. Although named as purchaser of 500,000 shares for $5,000, the circumstances lead to the conclusion that she was White's nominee, or at least that she gave him full voting control over the 500,000 shares acquired in her name. Of the 1 million shares issued to White and Mrs. Starr, 300,000 were later transferred by them to Bowman for reasons that are unclear, except that the transfer may have been connected with later activities in promoting sale of the stock. Although Bowman submitted his affidavit that he received the 300,000 shares in connection with sale of the assets of Thermal Dynamics Corp., he later changed this story and testified he received the shares as a commission on White's acquisition of control of Utah Fortuna.

& Co. in Toronto who would purchase it.[10] J. P. Cannon & Co. was a Toronto broker-dealer with which White had had extensive dealings, so much so, White testified, that he regularly held telephone conferences four times a day with Robert Fleischer, a registered representative of that firm. On April 24, 1967, Freeman, also a client of J. P. Cannon, instructed Fleischer to purchase 100,000 North American (Utah Fortuna) shares to be offered from Salt Lake City for the accounts of Lillian Freeman, his wife, and Bella Freedman, his mother-in-law. On the same date Frank M. Naft instructed Fleischer to buy 48,500 shares to be offered from Salt Lake City to the account of his wife.

In accordance with the advice received from White and Freeman from Toronto, Bowman, Whitney and Johnson began, on April 24, 1967 (the date when Freeman and Naft gave instructions to J. P. Cannon & Co. in Toronto), a program of acquiring most of the North American (Utah Fortuna) shares outstanding over and above the 1.2 million that had been the subject of the option to Whitney, and selling them to the Cannon and Hagglof firms in Toronto. Through the use of the company's stock transfer records, between April 24 and April 27, 1967, Johnson by personal solicitation acquired 188,500 shares from stockholders located in or about Salt Lake City which he sold to Bowman and Whitney, who in turn sold them at once through Griffith C. Lindquist, d/b/a Lindquist Securities Corp., a Salt Lake City broker-dealer, to J. P. Cannon in Toronto. On April 27, 1967, at the same time when Whitney exercised the opinion for purchase of the 1.2 million North American (Utah Fortuna) shares from South Utah and sold 1 million shares to White for $10,000, he simultaneously arranged with Johnson to have 100,000 shares (of the remaining 200,000) issued to Frank Whitney (his brother) and sold immediately at 1 cent per share through Lindquist to J. P. Cannon and another 100,000 shares issued to Glenn, who sold these shares on the same day to Hagglof. In all, during the period from April 24 to June 5, 1967, the Salt Lake City group (consisting of Johnson, Bowman and Whitney) acquired, in addition to the 200,000 shares from South Utah, 553,000 shares from other North American stockholders located in or near Salt Lake City, all of which were sold to the Cannon and Hagglof firms in Toronto as instructed by White, Freeman and Naft.

As the shares sold by the Salt Lake City group were transferred to Cannon or Hagglof in Toronto, they were placed in several accounts in the names of relatives and close friends of White, Freeman and Naft, including accounts in the names of Naft's wife (Corinne White), sister (Eleanor Joseph); Freeman's wife (Lillian Freeman), mother-in-law (Bella Freedman), and brother-in-law (Robert A. Smith); a secretary (Margaret Raphael) employed in the Toronto office of Freeman, Cooper & Naft; Morris Cooper, a close business associate of Freeman and Naft; Cooper's wife (Esther Oventhal), and mother-in-law (Frances Oventhal).

By June 27, 1967, as a result of the foregoing transactions, approximately 96.8% of the 1.8 million shares of North

---

10. Whitney repeatedly testified that the pre-April 27, 1967 transfers made by him to J. P. Cannon & Co. resulted from a call from White as follows:

"Q How did you know that J. P. Cannon & Company would be interested in purchasing the stock?

 \* \* \* \* \*

"A Mr. White had told me that they might have people interested in obtaining stock and if we were able to buy any. If I was able to buy any to call J. P. Cannon or Lars Hagglof &

Company in Toronto. When I obtained this, the Brayton and Eberthardt stock, I called Cannon and was informed that he would buy the stock through my broker and to put it in his name.

"Q And then that was subsequently done?

"A Yes."

Although Whitney later sought to cast doubt on this testimony, the Court accepts it as credible.

American outstanding was thus under the control of the White-Freeman-Naft trio, including the 1 million shares held by White and his friend Sonia Starr, and the 753,000 shares acquired through Cannon and Hagglof held in the names of friends and relatives of the trio. The Court is convinced from the proof of all of the surrounding circumstances, including the systematic acquisition of the stock, the close relationship between the trio and the parties in whose accounts the stock was held in Toronto and the subsequent distribution of the shares, that the 753,000 shares were acquired in Toronto with a view to the distribution of all or a very substantial portion of it in the United States.

As the White-Freeman-Naft trio, during the period from April 24 to June 27, 1967, were thus acquiring almost all outstanding North American shares, they were simultaneously laying the groundwork for distribution of the 753,000 shares held in Toronto, a program that was closely tied in to White's efforts to promote his newly-acquired corporate shell. Although he had originally planned to use the company as a vehicle for market exploitation of Canadian mining shares to be placed in it, which he testified were difficult to market in the United States through a Canadian enterprise, a new opportunity was presented immediately upon his acquisition of control and was quickly seized upon by him and his associates as a prospect that would be more appealing to the imagination of prospective over-the-counter traders in the stock. On his April 27, 1967 visit to Salt Lake City to acquire control of Utah Fortuna, White was accompanied by Naft, the same individual who thereafter participated with Freeman in arrangements for acquisition of the Utah Fortuna stock in the names of Canadian accounts. On April 28, 1967, White accompanied Naft

from Salt Lake City to Helper, Utah, to visit the inoperative pilot plant owned by Thermal Dynamics Corporation which had been built to test production of pollution-free coke under a patent process known as the Storrs Process. The owner of Thermal was none other than K. Ralph Bowman who had assisted White to obtain control of Utah Fortuna (North American), and Thermal's secretary was Whitney, the purported seller of control of Utah Fortuna to White. After seeing the pilot plant, White decided to use the Storrs Process as a vehicle for promotion of Utah Fortuna, the name of which was appropriately changed to North American Research and Development Corporation.[11] On May 19, 1967, three weeks after acquiring control of North American, White (on behalf of North American) entered into an agreement with Bowman, president and controlling stockholder of Thermal, for the purchase by North American of all of Thermal's assets, including its patent application on the Storrs' Process, the anti-air pollution device that converted coal into coke, for 330,000 North American shares plus a royalty on coke produced by the process. White's next move was on May 26, 1967, to transfer to North American some unpatented copper mining claims located in the Coppermine River area of the Northwest Territories of Canada, which were acquired from one Robert Rosenblatt for 200,000 shares of North American stock which were to be, but never were, issued. Although the property that was the subject of these claims was close to areas where ore had been discovered, there were no mines on the property, no ore had been extracted from it, and North American could not determine without substantial exploration and development (which it did not have the funds to finance) whether the property contained any such ore.[12]

11. The change of name was made effective at a stockholders meeting held on June 19, 1967.

12. Some idea of the speculative nature of this "asset" can be gathered from the fact that in August, 1967 according to

White, he agreed to pay $10,000 to Rosenblatt for the 200,000 shares that were to be issued to Rosenblatt, or 5 cents per share, after the over-the-counter price of the shares, prior to suspension of trading, had risen to more than $6 per share.

Having thus vested the corporate shell with the kind of "assets" that might, with salesmanship, entice investors in speculative securities, the group's next step was to prepare a sales brochure in the form of a "Progress Report" that might lend apparent substance to the company, following which they commenced drumming up interest on the part of possible buyers of the company's stock and arranging for the marketing of the Toronto-held shares in the United States. On June 19, 1967, a meeting of North American's stockholders was held in Utah at which White, appearing with proxies from 1.5 million out of a total of 1.8 million shares outstanding,[13] was elected chairman of the board and Lewis Dillman, another of his Canadian colleagues, became president. K. Ralph Bowman was chosen as secretary-treasurer. White and Dillman then set to work preparing the "Progress Report" which described generally the air pollution problem faced by American cities and pointed out that a research study indicated that the Storrs Process would enjoy a large market area in coal mining centers in the western part of the United States. The "Progress Report," without providing any financial information, conveys the impression that North American was well capitalized and ready to continue profitable operation of its pilot plant to meet a large market demand, with a program for locating processing plants in or near coal mining centers, which would be either "directly owned" by it or "by others under a leasing or royalty agreement". The report was distributed to stockholders and various stock brokers in the United States in early July, 1967, and was one of the principal selling media used to effect distribution into the United States of approximately 200,000 shares held in the Toronto accounts.

With the stage thus set for the introduction of the stock into the United States, White, Freeman and Naft began talking up the North American stock to various broker-dealers in the United States, stirring up a demand for it and arranging for simultaneous introduction of the shares from Toronto to key cities in the United States with a view to having the stock open up for trading on the over-the-counter market in the United States on or about June 27, 1967. In addition to devoting their personal efforts to implementation of the foregoing scheme, White, Freeman and Naft enlisted the support of numerous other persons, including broker-dealers, registered representatives, a securities chartist, and others. A series of witnesses called by Commission counsel testified in detail to these promotional activities in various locations of the United States, both prior to and after the introduction of the stock from Canada into the United States market at the end of June, 1967. This proof reveals that White personally discussed the stock with broker-dealers and registered representatives in Toronto, Los Angeles and New York, including J. P. Cannon & Co.; Lars Hagglof & Co. (with which he arranged for purchase of shares for Jack Wayne of New York City); Howard Alweil (Vice President, Bateman Eichler, Hill Richards, Beverly Hills office); Joseph Klein (Vice President, Bache & Co., Beverly Hills office); Rex Reno (Roberts, Scott & Co., Inc., San Diego, Laguna Beach and Los Angeles); Duke Hunter (Wellington Hunter Associates, Jersey City); Martin Orenzoff, a securities chartist; Alfred Blumberg (President, S. J. Rothman Corp., broker-dealer, New York City); Judy Cannon (Bateman Eichler); Ray Weiss, a trader with Allessandrini & Co., a New York broker-dealer; and Ray Lee a trader with N. L. Sandler, a Canadian securities firm.

An example of how White operated is gained from testimony of several representatives of the Beverly Hills office of Bateman Eichler, Hill Richards and of

---

13. At this point White held in his own name 350,000 shares. In addition to 350,000 shares in Sonia Starr's name, White obtained proxies from most of the balance of the issued stock, which was held in the names of his Canadian friends, plus 300,000 that had been transferred to Bowman.

Bache & Co. Following the June 19, 1967 North American stockholders meeting in Salt Lake City, White and Freeman flew to Los Angeles where they engaged in a series of conversations with officers and registered representatives of these brokerage firms in which they painted a glowing prospect for North American's future, based on their description of the Storrs Process and the great prospective market for anti-pollution coke. Lacking any detailed information or financial reports, White and Freeman resorted to typical touting tactics, including dramatic presentation of samples of the coke represented to have been successfully produced at the pilot plant in Helper, Utah, even though it had not operated since 1964.[14] Following such talks, White advised representatives in the brokerage concerns visited by him that the stock would "open up" in the Los Angeles market on June 26 or June 27 at about $2 per share, emanating from J. P. Cannon & Co. of Toronto, and recommended to friends in effect that they get in on the ground floor and purchase some shares as soon as the market opened. Among these friends was Miss Judy Cannon, an employee of the Bateman Eichler firm, who became a companion of White on his June, 1967 visit. She testified to conversations between White and Freeman in which, when Freeman stated that they would get the market price of the stock up to $100 a share, White countered that they could not take up the price of the stock that high for the reason that if they did so they would have the "SEC on their neck", and "That they were going to take it slowly up to $10. That it can't move too fast because it was bad for a stock to move too fast." Although certain testimony given by Miss Cannon and other witnesses was contradicted by White, after careful observation of the witnesses I find their testimony to be credible and reject that given by White.

After thus putting out the bait and sowing the promotional seeds in the United States, the final step in the consummation of the scheme was to arrange for quotation of the shares in the Pink Sheets in the United States, the introduction of shares from the Canadian accounts to broker-dealers previously contacted and the continued stimulation of public investor interest through distribution of the "Progress Report" to registered representatives and investors, accompanied by further sales talks. Wellington Hunter, a Jersey City broker-dealer, was induced by White and Naft to quote North American shares in the Pink Sheets beginning on June 27, 1967, at $2¼ bid, $2¾ offered and to commence trading the stock by purchase of 25,000 shares from the Toronto account in the name of Naft's wife, Corrine White. At the instance of Guido Volante of Dunhill Securities, Vincent Martinelli, a broker-dealer, quoted the stock in the Pink Sheets at the same time. Beginning in early July, 1967, trading in the shares in the United States was stimulated by North American's distribution of the "Progress Report" to various broker-dealers and investors.

The opening of the market in the United States signalled the purchase of North American shares by most of the broker-dealers to whom the group had talked, including Dunhill, which commenced trading on June 27, 1967, by purchasing shares from one of the Toronto group's Canadian accounts (Dombrofsky, Morris Cooper's sister) and later from another (Frances Oventhal, Cooper's mother-in-law). As a result of an earlier visit by

14. Joseph Klein, a Vice President of Bache & Co. in Beverly Hills, Calif., testified as follows:

"A I recall very vividly [White] walked in and had a piece of coke in his hand, he rolled it on my desk and said, 'Here is a situation that can be tremendous.'

I picked it up and said, 'What is it?'

He said, 'That is coke.'

'What about it?'

He said, 'I have come across a situation wherein we have a process to take sulphur and oil out of coal to alleviate smog conditions wherever this material can be used or this particular formula they have in removing it is used.'" (Tr. 656)

Blumberg in June to Toronto, during which White and Cooper furnished him with promotional information with respect to North American, Blumberg told various investors in and about New York that the stock was a good buy and would increase in value, and furnished copies of the "Progress Report" to some. Thereafter some of these investors bought shares through Dunhill, which distributed 47,700 shares acquired from Canada to about 35 customers in the United States.

Beginning on the opening date, June 27, 1967, the Bateman Eichler firm, as a result of the earlier efforts of White and Freeman, bought 40,000 North American shares from J. P. Cannon, plus 26,425 shares from other broker-dealers in the United States, which it distributed to approximately 50 investors. Similar purchases of North American shares from Canada were made by Roberts Scott & Co., Inc. of San Diego and Laguna Beach, Calif., for distribution to its customers, after White had discussed North American with Rex Reno, a registered representative of the Roberts Scott firm.

The purchases of shares by certain investors in the United States were stimulated not only by the foregoing activities but also by the defendant Martin Orenzoff, a securities analyst and chartist who travelled with White on a trip to Los Angeles in June, 1967. Orenzoff told one registered representative (Miss Myrna Lebowitz of Coggeshall & Hicks) about the patent acquired by North American for extraction of coke from bituminous coal for the purpose of cutting down air pollution and stated that it was "an interesting speculation", providing the same representative with copies of the "Progress Report". In addition Orenzoff told a person having a number of discretionary accounts (Miss Eileen Sini of Jessup & Lamont) about North American, that it had a process for removing pollutants from coke and was an interesting speculation, as a result of which she purchased North American shares for two of her accounts.

Ramon Bowman (K. Ralph Bowman's brother) also assisted in the promotion and the sale of North American shares. On May 17, 1967, he purchased 120,000 North American shares from his brother and 6,140 shares from Richard Whitney. Mrs. Lee Phifer testified that in July, 1967 at Laguna Beach, Calif., Bowman gave her a brochure which contained the pictures contained in the "Progress Report", that he pointed out that the process could be used in Los Angeles and Tokyo, and that except for additional money the company was "all ready to go". Bowman then used the White sales technique of producing a piece of the coke which he showed to Mrs. Phifer, informing her that the process would stop air pollution and smog, all with the result that a few days later she purchased 225 shares of North American.

As a result of the foregoing efforts, from June 27, 1967, the date when North American shares were first listed in the Pink Sheets in the United States, until July 20, 1967, when the SEC suspended trading in the stock, 197,397 shares were sold from Canada into the United States. All of these shares were derived from those acquired by the Bowman-Whitney-Johnson group and sold to Hagglof and Cannon in Toronto during the period from April 24 to June 5, 1967. Of the 197,397 shares, 144,397 shares came directly from the Toronto accounts where they were held in the names of friends and relatives of White, Freeman and Naft. In addition, 38,000 shares came from a Toronto broker-dealer named Redroof Trading Co., and 14,450 from another Toronto broker-dealer, J. L. Goud.

Of the 197,397 shares thus sold from Canada into the United States, 52,100 shares were traced through records as coming directly from the 388,500 shares sold by the Bowman-Whitney-Johnson group to Cannon and Hagglof prior to April 27, 1967, when White acquired control of North American. Although the proof does not permit determination of the precise dates when the balance of the shares were transferred from Salt

Lake City to Canada and while this decision does not depend in any respect on such fact, it may reasonably be inferred that a substantial percentage probably was transferred to Canada prior to April 27, 1967. Statements by defendants' counsel to the effect that there was extensive trading in the North American shares in the Canadian market during the period prior to June 27, 1967, are not supported by any reliable proof.

During the period from June 27, 1967 (when the North American shares were first listed in the Pink Sheets in the United States) until July 20, 1967, the over-the-counter market price of the stock rose from $2 per share to more than $6 per share.

It was in the light of the foregoing background that the SEC, on July 20, 1967, suspended trading in North American shares and thereafter moved this Court for preliminary injunctive relief. *Violations of the Registration Provisions of § 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).*

The SEC seeks preliminary injunctive relief on the ground that defendants' activities have violated, and threaten to continue to violate, §§ 5(a) and 5(c) of the Securities Act by using interstate facilities and the mails to sell and deliver unregistered North American shares, and to offer to buy or sell such unregistered shares.

The fact that unregistered North American shares were offered and sold in the United States through such facilities is not disputed. Defendants, however, claim the shares were exempt under § 3(a) (1), which relieves from operation of the statute "any security which, prior to or within sixty days after May 27, 1933, has been sold or disposed of by the issuer or bona fide offered to the public." (15 U.S.C. § 77c(a) (1)).

The SEC, conceding that North American's shares were first issued prior to July 27, 1933, contends that the exemption does not apply to the shares distributed by the White-Freeman-Naft group from Canadian accounts into the United States during the period here involved

for the reason that the distribution of these shares constituted a "new offering" falling within that provision of § 3(a) (1) which states "but this exemption shall not apply to any new offering of any such security by an issuer or underwriter subsequent to such sixty days." (§ 2(11), 15 U.S.C. § 77b(11)). An "issuer" is defined for such purpose as including "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." (15 U.S.C. § 77b(11)). An "underwriter" is defined as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."

The SEC contends, in effect, that in view of the existence of a joint venture or conspiracy between the principal defendants (i. e., the White-Freeman-Naft trio and the Bowman-Whitney-Johnson group in Salt Lake City) these defendants must be treated jointly as "underwriters" as that term is used in §§ 3(a) (1) and 2(11), since they performed various underwriting functions for a person "controlling * * * the issuer"; and that their rejuvenation of North American, their acquisition of 96.8% of its outstanding shares, their funneling of 753,000 of those shares to Canada, and their distribution of approximately 200,000 of the shares into the United States, constituted a new or secondary offering by underwriters, from whom it was purchased by United States broker-dealers for distribution to the public in the United States. At first blush, this contention appears to have some merit, since the surrounding circumstances, particularly the joint action of the White-Freeman-Naft trio pursuant to one overall scheme, might warrant the inference that White, who acquired control of North American on April 27, 1967, had some beneficial interest in the 753,000 shares held in var-

ious Toronto accounts in the names of relatives and close friends of the trio, which formed the source of the distribution into the United States. For purposes of preliminary relief, however, it appears unnecessary to make such a finding, since the pre-April 27th purchases of 388,500 shares from those then in control of North American (Utah Fortuna), were made with a view to distribution. Bearing in mind that the purpose of § 5 is to protect public investors by requiring registration with the Commission and disclosure of information not only with respect to primary distributions by the issuer, but also with respect to secondary distributions by persons in a control relationship with the issuer. SEC v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); I Loss, Securities Regulation 183–84, the secondary distribution of the 388,500 shares constituted a violation of § 5, warranting relief regardless of whether White acquired a beneficial interest in those shares.

■■ Starting with April 24, 1967, the first date on which a transfer of North American shares to Canada was made, it is clear that South Utah Mines was a "person * * * controlling * * * the issuer," i. e., a control person, and that it continued as such up to April 27, 1967 (when White acquired control), since it owned more than 50% of the outstanding shares of North American (Utah Fortuna). During the same period Mrs. Mabel McGarry, president and owner of 70% of South Utah's issued stock, was a person in control of North American (Utah Fortuna) because she had the necessary power to obtain its signature on a registration statement, SEC v. Micro-Moisture Controls, Inc., 148 F.Supp. 558, 562 (S.D.N.Y.1957); II Loss, Securities Regulations 780–81. Robert A. Johnson acted in a dual capacity. As South Utah Mines' secretary-treasurer, who acted as Mrs. McGarry's business advisor, he was an "issuer", i. e., a person controlling North American (Utah Fortuna), because his position as a director and officer of South Utah

and his relationship with Mrs. McGarry enabled him to exercise a persuasive and decisive influence in the managerial and financial decisions made by her and South Utah with respect to voting of North American stock owned by it. Stadia Oil & Uranium Co. v. Wheelis, 251 F. 2d 269 (10th Cir. 1957). In selling shares on behalf on South Utah, Johnson was also acting as "underwriter", since he was distributing shares for a "controlling person".

■ Whether or not Whitney, who, after acquiring the option for 1.2 million shares, had the power to determine what would be done with the controlling interest, is considered to be a control person within the meaning of § 2(11), but see Phillips v. SEC, 388 F.2d 964 (2d Cir.1968), however, or merely a person participating jointly with Johnson, a control person, the legal consequences are the same for the purposes of the present case, since the evidence reveals that during the period between April 24, 1967 and April 27, 1967 (when control passed to White) there were substantial sales of shares by persons in control (South Utah and Johnson) to underwriters purchasing with a view to distribution. For instance, 200,000 shares owned by South Utah were offered by Johnson, *qua* underwriter, on April 20, 1967 to Richard Whitney. On April 27, 1967, Whitney transferred these shares to Frank Whitney and Glenn, who simultaneously resold these shares through Lindquist Securities Corp. to J. P. Cannon & Co. and Lars Hagglof & Co., Ltd. in Toronto, pursuant to the recommendations of White and Freeman, who, with Naft, were acting with a view to ultimate distribution of a substantial portion into the United States. During the same period, i. e., from April 20–27, 1967, Johnson, a control person, arranged for the purchase by himself, Whitney and Bowman of an additional 188,500 shares from old North American (Utah Fortuna) stockholders located in and about Salt Lake City, all of which were immediately sold through Lindquist to J. P. Cannon and Hagglof as per instructions from the White-Free-

man-Naft combine. In these transactions Whitney, Glenn and Bowman acted as "underwriters" within the meaning of § 2(11) since they were purchasing from an issuer (i. e., a control person) with a view to distribution.

Thus the 200,000 shares transferred by Johnson on behalf of South Utah to Frank Whitney and Glenn, together with the balance of 188,500 shares acquired by Johnson, a "controlling person", and sold by him to Richard Whitney and Bowman jointly for sale through Lindquist prior to April 27th, represented a secondary offering by underwriters which had the effect of destroying the § 3(a) (1) exemption that would otherwise attach to the shares. The mere fact that Frank Whitney, Glenn and Bowman were not in privity of contract with South Utah, Johnson or Mrs. McGarry, does not alter their status as underwriters, since they were all jointly participating in one plan and scheme, concocted and guided by White, Freeman and Naft, to purchase the shares with a view to ultimate distribution to the public. An underwriter within the meaning of § 2(11) includes one who "participates or has a direct or indirect participation in any such undertaking". SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959); SEC v. Chinese Consol. Benev. Ass'n, 120 F.2d 738 (2d Cir.), cert. denied 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941); SEC v. Van Horn, 371 F.2d 181 (7th Cir. 1966), and it is just as unnecessary to show that each participant knew all aspects of the scheme as it is to prove that every co-conspirator knew all facets of an illegal conspiracy. See United States v. Nuccio, 373 F.2d 168 (2d Cir. 1967). However, defendants Abby Whitney, Norma C. Bowman, and Albert A. Conrad, who did not acquire their shares from Johnson until after he had parted with control on April 27, 1967 are not underwriters, because they did not purchase from a person presently having the power to obtain the issuer's signature on a registration statement. SEC v. Micro-Moisture Control, Inc., supra; II Loss, Securities Regulation 780-81.

Since purchase from an "issuer", or a control person, is a necessary element in the underwriter definition, the absence of this requirement in the case of these three defendants absolves them from liability.

An essential link in the chain of illegal distribution was the defendant Griffith C. Lindquist of Salt Lake City, a broker-dealer doing business as Lindquist Securities Corp., which acted as an "underwriter" within the meaning of § 2 (11) in selling the North American shares to Cannon and Hagglof in Toronto for ultimate distribution to the public. Lindquist argues that he is not an underwriter for the reason that the term is defined in § 2(11) not to include one whose interest "is limited to a commission from an underwriter * * * not in excess of the usual and customary distributors' or sellers' commission". Nevertheless, Rule 141(c) excludes from this exemption one "who performs the functions normally performed by an underwriter or underwriting syndicate". (17 C.F.R. § 230.141(c)). Lindquist sold 288,500 (over 70%) of the shares sold by controlling persons. Furthermore, during the period between April 24 and June 5, 1967, Lindquist acted as a seller's broker as to 653,000 shares, 50,000 of which were sold by Robert Johnson.

In SEC v. Culpepper, supra, a dealer who purchased 207,000 of the 710,000 illegally distributed shares was held to be an underwriter for the reason that even though he purchased all of his shares from other brokers, he had a close association with the people in the control group, and had consciously engaged in steps necessary to the consummation of the public distribution of the shares by the issuer. The principle is applicable to Lindquist, who sold more than 70% of the illegal distribution and was closely acquainted with a person in the control group, i. e., Johnson. Lindquist's role in the undertaking was sufficiently essential to make him a person who "participates" in the underwriting as that term is used in § 2(11), even if he was merely receiving an ordinary commission.

The Securities Act of 1933 was designed to protect the investing public by requiring a full and accurate disclosure of all material facts. SEC v. Chinese Consol. Benev. Ass'n, supra. Where a widespread distribution of these securities has been effected, the benefits of this legislation should not be thrust aside. United States v. Wolfson, 269 F.Supp. 621 (S.D.N.Y.1967). Accordingly Lindquist must accept responsibility for his participation in the illegal distribution.

 Several defendants contend that since they sold North American shares to Cannon and Hagglof in Toronto, Canada, they are entitled to an exemption on the ground that the shares were purchased solely with a view to distribution into Canada. Where an offering is made to persons *exclusively* outside of the United States, it is exempt from § 5 because § 4(1) exempting transactions "not involving any public offering" had as its purpose to require registration only as to those public offerings that were made in the United States. I Loss, Securities Regulation 368–69. This is in accord with the presumption that legislation is not to apply extra-territorially. American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826 (1909); United States v. Pizzarusso, 388 F.2d 8 (2d Cir. 1968); I Loss, Securities Regulation 369. On the other hand, where an offering is made to dealers outside the United States who are purchasing with a view to distribution into the United States, or into both the United States and Canada, the exemption is inapplicable. Morris M. Schwebel Sec. Act Rel. 4304 (1960) pp. 17, 19–20; I Loss, Securities Regulation 369. After reviewing the evidence for the purpose of determining the purchasers' intent, I Loss, supra at 665; see SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248, 252–253 (D.Utah 1958), it is clear that the Canadian purchasers bought the 753,000 shares from Lindquist and Babcock & Co. with a view to distribution of a substantial percentage of the shares into the United States pursuant to the White-Freeman-Naft basic scheme. Of the 753,000 shares, 388,500 represent tainted stock purchased from control persons prior to April 27, 1967 (at which time control went to White) and placed in accounts in the names of the wives of Freeman and Naft, the mother-in-law of Freeman and the sister of Naft. Even if it is assumed that White did not have a beneficial interest in the 388,500 shares and that title to the shares was held by these close relatives of Freeman and Naft, all of the surrounding circumstances (including their later simultaneous distribution of the shares, beginning on June 27, 1967, into the United States) lead the Court to the inescapable conclusion that these close relatives and friends from the outset lent themselves to a scheme which contemplated later distribution of a substantial percentage of the tainted shares into the United States. The situation parallels that in SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248, 256 (D. Utah 1958), where the court stated:

> "Even without this direct evidence it rather clearly appears that Pennington and his associates in Canada were mere conduits through which stock was to be distributed in the United States."

Having in mind that the exemption extended to distributions *exclusively* outside the United States is not available as the result of express statutory provision, the defendants seeking to invoke it fail to sustain their burden.

As indicated above, the Court finds that the 388,500 shares transferred to the above-mentioned Canadian accounts prior to April 27, 1967 (the date when White acquired control of North American) represented tainted stock purchased from control persons with a view to ultimate distribution into the United States. Although the balance of the 753,-000 shares, amounting to 364,500 shares, were purchased after April 27, 1967 for the same purpose, control of North American passed on April 27 to White, so that the Johnson-South Utah group were no longer control persons at the time of

their sale of these latter shares. The Court believes that further hearings, which would be required to determine whether White had a beneficial interest in the 364,500 shares purchased from the Johnson-Bowman-Whitney group after April 27, 1967, are not justified, since they would only prolong an already protracted preliminary proceeding. Accordingly, for the purposes of preliminary relief only, the Court finds that the 364,500 shares sold to the Canadian accounts after April 28, 1967 were entitled to § 3(a) (1) exemptions, 15 U.S.C.A. § 77c(a) and (1). Since all of Lars Hagglof's transactions as a purchasing broker-dealer involved shares that were purchased after April 28, 1967, his conduct did not fall within the prohibitions of the Act.

Various of the defendants played widely different roles in the distribution of tainted North American shares into the United States market.[15] Since their roles varied so widely, these defendants must be considered according to their differing categories. Some defendants (Redroof, Rosen, Volante, Hunter and Dunhill) acted as "dealers" within the meaning of § 2(12),[16] 15 U.S.C. § 77b(12), in the sale of the shares. They contend that they were entitled to a § 4(3) dealers' transaction exemption in their handling of the shares.[17] Section 4(3), however, provides that the "dealer's transaction" exemption does not apply to "transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter". (15 U.S.C.A. § 77d(3) (A)). Relying on this latter provision, the SEC contends that the 40-day period began running with respect to the new or secondary issue of North American shares when the tainted shares were first offered publicly in the United States in the latter part of June, 1967, and that these dealers were not therefore entitled to transaction exemptions with respect to their distribution of tainted stock into the United States. The dealers reply that they are entitled to the exemption for the reason that the 40-day period had long since begun with the bona fide public offering of North American shares in January, 1933, when the company was organized and its stock was first distributed to the public. This raises the question of whether, even though the § 3(a) (1) exemption may be

---

15. Redroof, Rosen, Hunter, Dunhill, Volante, Blumberg, Orenzoff, Dillman, Ramon Dunhill and White.

16. § 2(12) "The term 'dealer' means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."

17. § 4(3) "transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction), except—

"(A) transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter,

"(B) transactions in a security as to which a registration statement has been filed taking place prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days

after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter after such effective date, whichever is later (excluding in the computation of such forty days any time during which a stop order issued under section 8 is in effect as to the security), or such shorter period as the Commission may specify by rules and regulations or order, and

"(C) transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter.

"With respect to transactions referred to in clause (B), if securities of the issuer have not previously been sold pursuant to an earlier effective registration statement the applicable period, instead of forty days, shall be ninety days, or such shorter period as the Commission may specify by rules and regulations or order."

lost by reason of a new offering by an issuer or an underwriter, it remains with respect to dealers by virtue of the § 4(3)(A) exemption. The answer necessitates a review of the purpose of the 40-day requirement.

■ The purpose of the 40-day requirement was to prevent dealers from even unknowingly taking part in a distribution during that period. H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) 15; I Loss, Securities Regulation 183. In 1964, § 4(3) was amended to impose the requirement that a dealer furnish a prospectus for a period of 90 days after the commencment of a distribution in connection with transactions of registered securities of a company which had not been previously sold pursuant to an effective registration statement. The amendment was part of legislation designed to strengthen the regulation of over-the-counter broker-dealers. 2 U.S. Code Cong. & Admin.News, 88th Cong., 2d Sess., p. 3014 (1964). The Congressional design in enacting these provisions is to have the broker-dealer community act as guardians of the investing public by furnishing prospectuses when these are available. That purpose is effectuated by requiring that dealers make certain that the shares traded by them do not emanate from a controlling person who has made a public offering in the United States within the 40-day period prior to the time of the dealer's transaction.[18] Professor Loss takes this view, stating that § 5 must be read as if applied to

"any transaction by an issuer or underwriter in connection with a 'primary' distribution (that is, a public offering) by the issuer, or a 'secondary' distribution by a person in a control relationship with the issuer, or any transaction by a dealer within forty days after the beginning of such a distribution or during such longer period as he personally may still be

engaged in distributing." (I Loss at 183–84)

■ It therefore must be concluded that the bona fide new offering of North American shares into the United States did not take place prior to June 27, 1967, when the stock first appeared in the Pink Sheets.

In this case Redroof Trading Co., which purchased 38,200 shares, including 100 tainted shares sold to Wellington Hunter in the United States, should have either obtained copies of the North American transfer records, which would have revealed South Utah Mines' sale for distribution of the 200,000 shares or have made inquiries to the SEC. SEC v. Culpepper, 270 F.2d 241 at 251 (2d Cir. 1959); SEC v. Franklin Atlas Corp., 154 F.Supp. 395 (S.D.N.Y.1957); SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248 (D.Utah 1958). Alternatively, Redroof could have waited until 40 days after June 27, 1967 when the stock was publicly offered via the Pink Sheets within the United States.

■ For the foregoing reasons the defendants Sidney Rosen, Wellington Hunter, Dunhill Securities Corp. and its president, Guido Volante, are not entitled to § 4(3)(A) dealer's transaction exemptions with respect to their purchase and sale of tainted North American shares. Rosen, the president of Valutrend, in placing orders upon the instructions of Redroof, for which he received a fee of $2,500, was a person engaged as an agent in the business of offering, selling or otherwise dealing or trading in securities, who is classified under § 2(12) as a "dealer" in handling such transactions, which violated the Act. Likewise Wellington Hunter, who acted as a broker-dealer in transactions involving at least 2,000 tainted shares purchased from Naft's wife, Corinne White, who was herself an underwriter, acted as a dealer. Although Wellington Hunter was entitled to a § 4(4) exemption for "brokers'

18. This result is confined to the situation in which the illegal offering by controlling persons is the first public offering of the security occurring after 1933, when the Securities Act went into effect.

transactions executed upon customers' orders in the over-the-counter market" and there is no evidence of solicitation destroying such exemption, the proof does reveal other conduct on its part amounting to performance of a function essential to the entire distribution, which made an "underwriter". See SEC v. Chinese Consol. Benev. Ass'n, supra; SEC v. Van Horn, 371 F.2d 181, 188 (7th Cir.1966); Rule 141(c). For instance, its conduct in causing North American stock to be listed in the Pink Sheets constituted an act "normally performed by an underwriter or underwriting syndicate" which precluded it from invoking the § 4(1) exemption. SEC v. Culpepper, supra; SEC v. Chinese Consol. Benev. Ass'n, supra. Hunter's association with White, who controlled North American and was supplying Hunter as a broker-dealer with necessary information to perform a vital function in the distribution of its shares, was sufficient to require questioning into the circumstances surrounding the illicit distribution. Sec. Act Rel. 4445 (1962) 2.

With respect to Dunhill Securities Corp., and its president, Guido Volante, 10,000 of the shares that came through its hands have been traced directly to the tainted shares that emanated from Utah prior to April 27. Between June 27 and July 20, 1967, 47,700 shares that it had acquired in Canada were sold to various brokers and to the firm's customers. On July 13, 1967, Mickey Osias, one of Dunhill's registered representatives, informed a number of the firm's customers about North American. Thereafter, upon the customers' inquiries into whether it was a good company, Osias stated that it had an "anti-pollution device" and that some of the companies were interested in looking into it. Thereupon the customers told Osias to purchase North American. Among the solicited transactions that appear to have involved tainted shares was the sale by Osias to Abe Gutman and Louis Wachs of shares previously in the account of Dombrofsky (Cooper's sister) with certificates registered in the name of Fran-

ces Oventhal (Cooper's mother-in-law). Having in mind that the burden of proving an exemption falls upon Dunhill, Securities & Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); SEC v. Culpepper, 270 F.2d 241 (2d Cir.1959); Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir.), cert. denied 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959), there is sufficient evidence to support the inference that Osias sold tainted shares to Gutman and Wachs.

Dunhill contends that its inquiries to Morris Cooper (Frances Oventhal's son-in-law), who also sold North American to Dunhill, and to Johnson (North American's transfer agent), inquiring as to North American's officers and directors and whether restricted stock bore legends, fulfilled its duty to make reasonable inquiry to ascertain whether the stock emanated from a control group. SEC v. Franklin Atlas Corp., 154 F.Supp. 395 (S.D.N.Y.1957); SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248 (D.Utah 1958). The "reasonable inquiry" defense is not the result of statutory exemption. The denial of injunctive relief in *Franklin Atlas*, the only case wherein the argument proved successful, was based largely on the theory that resumption of the illegal activities was unlikely. Reliance upon a seller's self-serving statements, SEC v. Culpepper, supra, or upon statements of corporate officials, Barnett v. United States, 319 F.2d 340 (8th Cir. 1963), is insufficient. An inquiry is deemed reasonable only where it rests upon a reliable investigation based upon documentary facts or upon an SEC opinion, as was the case in *Franklin Atlas*. Therefore, assuming that an inquiry into whether shares emanated from an issuer or an underwriter would discharge a broker-dealer's statutory obligation, this obligation was not discharged by Volante's efforts in this case. Osias' attempts to induce customers to buy constituted solicitations destroying the § 4 (4) exemption to which Volante would otherwise be entitled, since Osias' con-

duct, on the principle of *respondeat superior*, is attributable to Dunhill and Volante. Wonneman v. Stratford Sec. Co., 57–61 CCH ¶ 90,923 (S.D.N.Y.1959). The recent case of Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), does not indicate a different result, since the plaintiff there, unlike Osias' customers, could not have reasonably believed that the agents possessed the authority to engage in the improper transactions involved.

Turning to the people who did not sell any of the tainted shares, but nevertheless played a role in their distribution, White's conduct clearly falls within the prohibitions of the Act as interpreted by *Culpepper* and *Chinese Consol.* Pursuant to the scheme concocted by himself, Freeman and Naft, he procured and brought the acquisition and transfer of the 753,000 shares, including the tainted shares, to Canada and the distribution of those shares, including tainted shares, sold from Canada into the United States. By his solicitation of brokers in various parts of the country, from the Concord Hotel in the Catskills to the Polo Lounge in Beverly Hills, he opened up the arteries and veins through which the shares were pumped. He prepared the "Progress Report" which was distributed in early July to brokers and customers as the securities were first coming onto the market. As the owner of controlling shares, he was motivated by the desire to increase their value. Toward that purpose he participated as a key figure in effectuating the distribution into the United States, his objective being, as one witness quoted him, to "take the price up to $10".

In SEC v. Chinese Consol. Benev. Ass'n, supra, a patriotic association held mass meetings, used newspaper advertisements, and made personal appeals in an effort to induce the purchase of Chinese government bonds. The association also acted as a collecting agent and delivered moneys to the New York branch of the Bank of China, along with written applications by the prospective purchasers for the bonds which they desired to buy. The Hong Kong bank forwarded the bonds to the New York branch which mailed these to the purchasers sometimes in care of the association. The Association received no compensation and exacted no charge in any of these undertakings. At no time did the Chinese government know of or authorize the Association's efforts. The legal title to the bonds passed without ever getting into the Association. In enjoining the Association's activities, the Court said:

> "Whether the Chinese government as issuer authorized the solicitation, or merely availed itself of gratuitous and even unknown acts on the part of the defendant whereby written offers to buy, and the funds collected for payment, were transmitted to the Chinese banks does not affect the meaning of the statutory provisions which are quite explicit.

> \* \* \* \* \* \*

> "Even if the defendant is not itself 'an issuer, underwriter, or dealer' it was participating in a transaction with an issuer, to wit, the Chinese Government. The argument on behalf of the defendant incorrectly assumes that Section 4 (1) applies to the component parts of the entire transaction we have mentioned and thus exempts defendant unless it is an underwriter for the Chiese Republic. Section 5(a) (1), however, broadly prohibits sales of securities irrespective of the character of the person making them. The exemption is limited to 'transactions' by persons other than 'issuers, underwriters or dealers'. It does not in terms or by fair implicat'on protect those who are engaged in ceps necessary to the distribution cf security issues. To give Section 4(1) the construction urged by the defendant would afford a ready method of thwarting the policy of the law and evading its provisions." (120 F.2d at 740–41)

Where an individual undertakes activities that provide the driving force behind a distribution, the fact that the controlling person may not be aware of his purpose and function is of no mo-

ment, provided, as here, the "participant" is aware that his activities will effectuate the distribution of the new offering of the issuer or underwriter. With the transfer records in his possession, he was obliged to heed the warning given in *Culpepper*:

> " 'with all these red flags warning the dealer to go slowly, he cannot close his eyes to obvious signals which if reasonably heeded would convince him of, or lead him to, the facts and thereafter succeed on the claim that no express notice of these facts were [sic] served upon him.' " (270 F.2d at 251)

Lewis Dillman, North American's President, who helped in the preparation of the "Progress Report," did not have a sufficient nexus with the distribution to warrant a finding that he was a "participant". Comstock-Dexter Mines, Inc., 10 S.E.C. 358 (1941) (writer of sales literature held not to be an underwriter in the absence of having supervised sales campaign or solicited investors). Likewise, although Ramon Bowman, Alfred Blumberg, and Martin Orenzoff solicited the purchase of North American shares and distributed the "Progress Report," they did not receive financial remuneration for their activities and unlike White, they held no office in North American and except for Ramon (who sold only untainted shares) had no financial stake in the distribution of its shares. Such isolated sales efforts that were not essential to the overall distribution did not convert these individuals into underwriters, see Can-Am Petroleum Co. v. Beck, 61–64 CCH Fed.Sec.L.Rep. ¶ 91,365 at 94,541 (10th Cir.1964).

In summary, the rejuvenation of North American (Utah Fortuna), a worthless corporate shell, accompanied by a secondary distribution of a substantial percentage of its shares by those in a control relationship with it, presented the very type of situation toward which the Securities Act was directed. It called out for registration of those shares with the Commission and the detailed disclosure of information required by the Act for the protection of public investors to whom such shares were ultimately to be distributed under the White-Freeman-Naft scheme. There remains the question of whether, in addition to failure to register, the defendants violated the anti-fraud provisions of the federal securities laws.

*Violations of the Anti-Fraud Provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934*

The SEC contends that the activities of the defendants North American, White, Dillman, K. Ralph Bowman, Ramon Bowman, Dunhill, Volante, Blumberg, and Orenzoff, in preparing and disseminating the "Progress Report" in early July, 1967, to brokers and investors throughout the United States, and in making certain oral statements to dealers and investors, violated § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder. White and Dillman both wrote the report with a professional writer not named as a defendant. K. Ralph Bowman supplied the photographs that were used in the report.

After careful review and appraisal of lengthy testimony, documents, and affidavits, the Court concludes that the "Progress Report" was misleading in a number of material respects. Although the pilot plant had not been operating or in production since 1964, the report contains photographs showing men working at the plant, which creates the impression that the plant was currently in operation in July, 1967. The report further stated that processing plants would be established around coal mining centers "either directly owned by your company, or by others under a lease or royalty agreement." In fact, there was no intention to have North American own any of these operations. To the extent that the report gave the impression of contemplated ownership of processing plants, which cost at least $400,000 to $500,000 each to construct, it overstated the scope of North American's likely activities and could have misled purchasers of the security.

The report also stated that:

"Previously conducted feasibility studies of the Thermal Dynamic process at the Helper pilot plant, while of a limited nature, have indicated that a profitable operation can be anticipated by use of this process and the production of coke and the oil by-product.

"It is the intention of your Company, to carry out further Research and Development as well as production tests in the immediate future at the pilot plant. This should enable your Company to verify the commercial value of its process."

Defendants argue that this statement was truthful because the "Lummus" Report, compiled by an engineering firm in February, 1965, estimated that on assumed values in the market price of tar and coal, the cost of plant modernization, estimated at $167,000, would pay itself off in between two-and-one-half and five years. However, Charles Davis, a consulting engineer acting on behalf of Thompson-Starrett, who investigated the plant in May, 1967, was of the view that a 30–60 day feasibility study would have to be undertaken in order to determine whether the pilot plant at Helper, Utah, would be capable of economic operation. Furthermore, the Lummus Company recommended a 30-day trial run to demonstrate the feasibility of the process (Ex. D).

The failure of the report to disclose that the successful completion of such a study was a necessary condition to the commencement of operations was a material omission. It was not corrected by language that production tests to "verify the commercial value of its process" were being conducted, which merely gave the impression that the company had already decided to put the pilot plant into operation, with the verification being in the nature of a pro forma review, whereas a successful 30-day review was essential to decide whether the pilot plant, which had not been in operation for three years, should be reactivated.

The defendants contend that the statement that North American acquired "a fully equipped operating pilot plant which we propose to put into production at an early date" was so clear that no reasonable person could believe that the plant was in operation. This contention must be rejected for the reason that when this statement is read in conjunction with North American's acquisition of the plant, it conveys the impression that a Thermal Dynamics' *operating* plant had been just acquired and North American would take over the operation at an early date. The fact was that the plant had not been in operation since 1964.

A question is raised as to whether the above-mentioned defendants' activities in the preparation and use of the false and misleading "Progress Report" occurred "in connection with the purchase or sale of any security", which is an essential element of a violation of § 10 (b). Defendants North American, White, Dillman, K. Ralph Bowman, Blumberg and Orenzoff contend that since they were not involved in a sale of stock during the period when the "Progress Report" was given out and when oral solicitation took place, they have not violated § 10(b) or Rule 10b–5. There are cases on both sides of the question in this District, cf. Mooney v. Vitolo, 67 Civ. 1500 (S.D.N.Y.1967); Howard v. Levine, 262 F.Supp. 643 (S.D.N.Y.1965); Heit v. Weitzen, 260 F.Supp. 598 (S.D.N.Y. 1966), with SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 293 (S.D.N.Y.1966). In *Heit* the issuance of a false annual report with intent to artificially inflate the security's market prices was held not to impose liability upon corporate directors in the absence of an allegation that defendants' conduct occurred "in connection with the purchase or sale of any security". In *Texas Gulf Sulphur*, a false press release, transmitted by the corporation, was said to constitute a violation

"if its purpose is to affect the market price of a company's stock to the advantage of the company or its insiders. Freed v. Szabo Food Serv., Inc., CCH FED.SEC.L.REP. ¶ 91,317 (N.D.Ill. 1964)." (258 F.Supp. at 293)

However, as there was no finding that the press release was either misleading or deceptive, relief was denied as to this aspect of the case.

On the present facts, White caused the issuance of the false "Progress Report" to effectuate the distribution and sale of North American shares in the United States. His statement to Freeman and Miss Cannon that he would "take" or "move" the stock up to $10 per share demonstrates his purpose in preparing and using the report. Despite defendants' argument that the report endeavored to inform shareholders about the company, the absence of any mention of North American's copper mining claims, its failure to include financial statements (then in preparation), the prominence given to the apparently impressive number of issued shares, and the emphasis upon the market for products to combat air pollution, compel the conclusion that the report was solely a selling device. See I Loss at 216. For these reasons *Mooney, Howard* and *Heit*, where the fraudulent statements were not motivated principally by such purpose, are distinguishable. In *Mooney*, the intent was to bring about a price increase so that people would be induced to believe that the financial position of the bankrupt company was not hopeless. In *Howard* and *Heit* the frauds were directed at the Government, with market impact being of an incidental nature.

■ However, where false and misleading statements issued by corporate officers and directors, who are essential participants in a distribution of its stock, are motivated, as here, by the intent to effectuate a successful distribution and, in connection therewith, to increase the market price of its shares, such statements are made "in connection with the sale of the security". It matters not whether the directors endeavor to dispose of their own shares, Gann v. Bernzomatic Corp., 262 F.Supp. 301 (S.D.N.Y.1966); Acker v. Schulte, 74 F. Supp. 683 (S.D.N.Y.1947); I Loss, Securities Regulation 1454–55, those of the corporation, see Fischman v. Raytheon

Mfg. Co., 188 F.2d 783 (2d Cir.1951); Heilbrunn v. Hanover Equities Corp., 259 F.Supp. 936 (S.D.N.Y.1966); Stella v. Kaiser, 82 F.Supp. 301 (S.D.N.Y.1948); 15 U.S.C.A. § 78t(a), or, as here, the shares of their friends and associates, see Bromberg, Securities Law Fraud 4.5, at 79 (1967).

■ White, as chairman of the board and a director, prepared the "Progress Report" in an effort to sell shares that were held in the name of the Naft family, the Freeman family, and other Canadians who were known to him. The mere fact that he was marketing the shares of his friends rather than those of the corporation should not warrant a difference in result.

"§ 10b and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir.1967).

White and North American have therefore violated § 10(b) and Rule 10b–5, because of their utilization of the false and deceptive "Progress Report" with the intent that it operate as a persuasive weapon in effecting the distribution of North American shares.

■ K. Ralph Bowman, North American's secretary-treasurer, presents an *a fortiori* case. Pursuant to his conversation with Freeman in March, 1967, he found the corporate shell for White. He and his wife, Norma, continued selling North American (Utah Fortuna) shares as late as May 26, 1967 to Canadian brokers whom Freeman had suggested. Bowman had known Naft for three years prior to March, 1967, and the two had discussed the possibilities of Naft's acquiring an interest in Thermal Dynamics. Bowman and Naft had at least three meetings in the first half of 1967, at which discussions concerning the North American venture took place. Bowman

furnished the misleading photographs that conveyed the impression that the pilot plant was in production in 1967. Thus there was at least a "semblance of privity", Gann v. Bernzomatic Corp., 262 F.Supp. 301, 304 (S.D.N.Y.1966), with Bowman actually selling his own shares while engaged in a plan that "would operate as a fraud or deceit upon any person." Rule 10b–5(c).

There has been no evidence that Lewis Dillman, North American's president, engaged in the sale of the corporation's shares, that he had any relationship with Freeman, Naft and the other Canadians who engaged in the distribution, that he intended to effectuate a distribution of the North American shares, or that he realized any profit or gain as a result of the sales. Therefore, the principles laid down in Mooney v. Vitolo, 67 Civ. 1500 (S.D.N.Y.1967); Howard v. Levine, 262 F.Supp. 643 (S.D.N.Y.1965); and Heit v. Weitzen, 260 F.Supp. 598 (S. D.N.Y.1966), apply to absolve Dillman from liability for fraud on this motion for a preliminary injunction.

Dunhill and its principal stockholder, Guido Volante, made use of the "Progress Report" to stimulate the interest of customers and other broker-dealers in North American. Volante, who did not testify, submitted his affidavit denying that he ever sent any report to Bryan Greenman, a broker-dealer. However, Greenman, whom the Court finds credible, testified that during the June 27–July 19, 1967 period, when North American was actively trading, Volante sent him a copy of the "Progress Report". Many of Volante's other statements were refuted. For instance, despite his denial that reports were sent out to customers, Abe Gutman's affidavit asserts that Osias, a registered representative with Dunhill (Volante's firm), showed him a copy of the report and informed him that the security had promises of making him a dollar. Gutman thereupon purchased one hundred shares for himself and one hundred shares for his partner. Steven Bierer testified that he was told by Osias that North American had an air pollution device that other firms were interested in, and that the stock would go up, whereupon Bierer purchased one hundred shares. Vincent Martinelli, a broker, testified that he was asked by Volante to put North American stock in the Pink Sheets, Volante informing him that Dunhill was more interested in selling than buying the stock.

The facts are similar to SEC v. Broadwall Sec., Inc., 240 F.Supp. 962 (S.D.N.Y. 1965), in which a salesman's statements as to future market prices were actionable where there had been no basis in fact to justify such predictions. In this case, not only was there nothing to indicate any general interest in the Storrs Process on the part of other firms, but the one firm that was interested— Thompson-Starrett—demanded a 30-day feasibility study before determining whether the pilot plant was commercially feasible. These affirmative statements, taken in connection with all the surrounding circumstances, imposed upon Osias the duty to advise Dunhill's customers that the economic feasibility of the Storrs Process or the pilot plant at Helper, Utah, was undetermined. His failure to do so constituted a violation of the Act. SEC v. Broadwell Sec., Inc., supra at 968.

As the active head of Dunhill, who manages its operations and supervises its salesmen, Volante was openly endeavoring to interest other brokers in the stock, doing so at a party sponsored by Dunhill. Since he knew and desired his salesmen to solicit and push the North American stock to its customers, he is responsible for their statements, and his conduct violated § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934. SEC v. Rapp, 304 F.2d 786, 790–791 (2d Cir. 1962); SEC v. Broadwall Sec., Inc., supra.

With respect to Orenzoff and Blumberg, the proof reveals that Orenzoff touted the stock by stating that it was an "interesting speculation" (Tr. 686),

while Blumberg said he thought it was a good stock and that it would go up, and that each distributed copies of the "Progress Report" to broker-dealers. There has been no showing, however, that they either sold any North American shares, or realized any financial gain as a result of North American's distribution.

■ The SEC contends injunctive relief is in order because a broker-dealer who puts out his shingle impliedly warrants that he will deal fairly with the public and also that he will act as a fiduciary to the investor. See Kahn v. SEC, 297 F.2d 112, 115 (2d Cir.1961) (Clark, J., concurring). However, bearing in mind the need to limit the purview of the ever-expanding Rule 10b–5, Mutual Shares Corp. v. Genesco, '66–'67 CCH Fed.Sec.L.Rep. ¶ 91,983, p. 96,343 (2d Cir.1967), it should not be extended to persons such as Orenzoff and Blumberg, who do not derive gain as a result of their promotional activities and are not essential participants in a scheme of distribution. In such circumstances the requirement that the deceptive activities occur "in connection with a sale" has not been met.

During the June 26–July 19, period, Ramon Bowman, a dealer, sold at least 5,000 shares with Lindquist acting as purchasing broker-dealer. Bowman supplied Mrs. Phifer with a brochure containing the pictures included in the "Progress Report," and glowingly described the company's future, pointing out that it was about to begin operations. Within a few days she purchased 225 shares of North American.

Bowman, who purchased 120,000 shares of Utah Fortuna from his brother Ralph in May, 1967, attended the June 19, 1967 stockholders meeting which approved the acquisition of Thermal Dynamics. He also owned 100,000 shares in Thermal. Under these circumstances, and considering his blood relationship with K. Ralph Bowman, an officer and director who was well aware of the need

for further testing before the commercial feasibility of the pilot plant could be established, Ramon Bowman's statements and his handing out of the brochure imposed a duty to state the material facts necessary "in order to make the statements made . . . not misleading". Bowman conveyed the deceptive impression that North American was an ongoing, operating company which had a plant that was capable of economic production. As was said in SEC v. Franklin Atlas Corp., D.C., 154 F.Supp. 395, 400:

> " 'Representations as to value, soundness and worth of securities may go so far beyond what may be considered the proper limits of the exaggerating enthusiasm of the normal salesman, or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud.' "

■ Since Bowman's sales during this period satisfied the "in connection with a sale" requirement, Bowman has violated § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934. Under the "semblance of privity" test, the fact that Bowman may not have sold his shares directly to Mrs. Phifer does not absolve him from liability. This result is confined to the particular facts in which a 5% stockholder, closely related to a corporate officer, puts out false, misleading and deceptive information which induce the purchase of shares, during which period the defendant is engaged in the sale of his own shares.

■ The defendants urge that a preliminary injunction not issue pursuant to § 20(b) of the Securities Act and § 21(e) of the Securities Exchange Act, because there is no reasonable expectation that they will thwart the policy of the securities legislation by engaging hereafter in the proscribed activities. This request must be denied for the reason that a proper showing has been made and defendants' illegal conduct was only curtailed as a result of the SEC's stop order,

issued on July 20, 1967. The cessation of violations under these circumstances does not preclude the issuance of a preliminary injunction. SEC v. Boren, 283 F.2d 312 (2d Cir.1960); SEC v. Culpepper, 270 F.2d 241 (2d Cir.1959); SEC v. Broadwall Sec., Inc., 240 F.Supp. 962 (S.D.N.Y.1965). In the discharge of its duties as the watchdog of the investing public, see SEC v. General Securities Corp., 216 F.Supp. 350 (S.D.N.Y.1963), the Securities and Exchange Commission has come forward with clear and convincing evidence sufficient to establish a strong prima facie case. SEC v. Boren, supra. Under the circumstances, and, in view of the public interest in protecting investors against ventures of the type disclosed by the evidence, a preliminary injunction will issue against the following defendants who are grouped according to the statutes that have been violated:

*Violations of § 5 of the Securities Act*: North American Research and Development Corp., Edward White, Robert A. Johnson, Donald Glenn, K. Ralph Bowman, Wellington Hunter, d/b/a Wellington Hunter Associates, Dunhill Securities Corp., Guido Volante, Richard E. Whitney, Frank M. Whitney, Sidney Rosen, Redroof Trading Co., Ltd. and Griffith C. Lindquist, d/b/a Lindquist Securities Co.

*Violations of § 17(a) of the Securities Act, § 10(b) of the Securities Exchange Act and the rules and regulations thereunder*: North American Research and Development Corp., Edward White, K. Ralph Bowman, Ramon Bowman, Dunhill Securities Corp. and Guido Volante.

Preliminary injunctive relief is denied as to the following defendants: Lewis Dillman, Norma C. Bowman, Albert W. Conrad, Lars Hagglof & Co., Ltd., Alfred Blumberg, Abby Whitney and Martin Orenzoff.

The foregoing will constitute the findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

Settle order within ten (10) days.