SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

NORTH AMERICAN RESEARCH AND
DEVELOPMENT CORP., Edward White
and K. Ralph Bowman, Defendants-Ap-
pellants.

SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellant,

v.

NORTH AMERICAN RESEARCH AND
DEVELOPMENT CORP. et al.,
Defendants,

and

Martin Orenzoff, Alfred Blumberg, Lewis
Dillman and Lars Hagglof & Co.,
Ltd., Defendants-Appellees.

Nos. 61–63 and 180, Dockets 32246–32248
and 33817.

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1969.

Decided March 25, 1970.

Richard E. Nathan, Atty., S.E.C., Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Solicitor, and Meyer Eisenberg, Associate Gen. Counsel, S.E.C., Washington, D. C., on the brief), for Securities and Exchange Commission.

Leonard R. Glass, New York City (Glass & Greenberg, New York City and Arnold & Porter, Co-Counsel, Washington, D. C., on the brief), for defendants-appellants.

Spencer Pinkham, New York City (Parr, Doherty, Polk & Sargent, New York City, on the brief), for defendant-appellee Martin Orenzoff.

Ronald B. Bianchi, New York City (Glass & Greenberg, New York City and Arnold & Porter, Co-Counsel, Washington, D. C., on the brief), for defendant-appellee Lewis Dillman.

Before MEDINA, MOORE and FEINBERG, Circuit Judges.

MEDINA, Circuit Judge:

These appeals require us to consider once again the scope of Section 5 of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and the SEC's frequently litigated Rule 10b–5. The District Court preliminarily enjoined appellants North American Research and Development Corp., Edward White, its controlling stockholder and Chairman of its Board of Directors, and K. Ralph Bowman, its Secretary-Treasurer and a member of the Board of Directors, from violating Sections 5(a) and (c) of the 1933 Act [1] and Section 10(b)

---

1. Sections 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. Sections 77e(a) and (c) (1964):

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\* \* \* \* \*

(c) It shall be unlawful for any person, directly or indirectly, to make use

of the 1934 Act,[2] together with Rule 10b–5,[3] with respect to the purchase, offer or sale of the unregistered common stock of North American.

The court below refused to enjoin appellees Lewis Dillman, the President of North American; Alfred Blumberg, a New York stockbroker; Martin Orenzoff, a chartist and friend of appellant White; and Lars Hagglof & Co., Ltd., a Canadian stock brokerage firm with extensive ties to White and his friends, from violating any of the securities laws pursuant to which the SEC sought relief with respect to transactions in North American unregistered common stock. The SEC appeals, contending that Dillman, Blumberg, and Orenzoff should have been enjoined under Sections 5(a) and (c) of the 1933 Act, Section 10(b) of the 1934 Act and Rule 10b–5, and that Lars Hagglof & Co., Ltd. should have been enjoined under Sections 5(a) and (c), *supra*. The opinion of the District Court is reported at 280 F.Supp. 106 (S.D.N.Y.1968). That part of the order preliminarily enjoining North American, White, and Bowman is affirmed; that part refusing to grant any relief against Dillman, Blumberg, Orenzoff, and Lars Hagglof & Co., Ltd. is vacated and remanded to the District Court for further proceedings consistent with this opinion.

## I.

### The Facts

As a background to the numerous law points raised by the various appellants on the main and cross-appeal, we think it will be helpful to sketch a bird's-eye view of the central scheme and its component parts. Edward White, a self-styled promoter and securities trader with extensive connections and interests in Canada and in the United States, is the originator of the scheme. His principal associates and collaborators throughout were Sam Freeman, a Toronto stock trader, and another Toronto friend, Frank M. Naft. The first step was to find a publicly-owned corporation whose assets had been sold and the proceeds distributed "leaving it a worthless, inactive, empty shell, with neither assets nor liabilities"; to get control of the shell; to buy up for purely nominal amounts the stock held by the minority

of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

2. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b) (1964):
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 * * * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Rule 10b–5, 17 C.F.R. Section 240.10b–5 (1970):
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.

stockholders who considered the stock of no value; to funnel the shares thus purchased into the custody of cooperating brokerage houses in Canada, and to gain complete control by transferring these shares to close friends and relatives; to dress up the shell with assets of the type that could readily be blown up as having enormous potential value, without any substantial expenditure of cash; then to begin the process of touting, by sales pressure on American brokerage houses, culminating in the inclusion of the stock in the Pink Sheets used in connection with the over-the-counter market. At this point the word was "up," and seemingly only the sky was the limit. We may say by way of anticipation that up to this point the scheme worked according to the standard of other similar fraudulent schemes and without a hitch. From a start of ½ cent or a penny a share and at about $2 a share when first appearing in the Pink Sheets, the stock rose to over $6 a share before the SEC suspended trading and made its application to the District Court for the Southern District of New York for the preliminary injunctive relief which was granted and is the subject of this appeal.

How was all this accomplished? Freeman had friends in Salt Lake City, one of whom was K. Ralph Bowman. Bowman knew Richard Whitney and Whitney's friend Donald Glenn, also of Salt Lake City. Thus it was that Robert A. Johnson was located. He did indeed know of just such a shell as the triumvirate of White, Freeman, and Naft, as Judge Mansfield characterized them, were seeking. It was an inactive, publicly-owned Utah corporation named Utah Fortuna Gold Company; and Johnson was Secretary-Treasurer, a director, and transfer agent. He was also an officer, director, and transfer agent of South Utah Mines,

Inc., another Utah corporation, which was the owner of 1.2 million of the 1.8 million outstanding shares of Utah Fortuna. The controlling stockholder of South Utah was Mrs. Mabel McGarry, who owned between 70% and 80% of the South Utah stock. So Johnson, as Mrs. McGarry's business advisor and because of his position as a director and officer of South Utah, exercised a persuasive and decisive influence in the managerial and financial decisions of Mrs. McGarry with reference to the voting of the stock of South Utah. One of the key findings of Judge Mansfield was that Johnson was an "issuer," i. e., a person controlling Utah Fortuna "because his position as a director and officer of South Utah and his relationship with Mrs. McGarry enabled him to exercise a persuasive and decisive influence in the managerial and financial decisions made by her and South Utah" with respect to voting the stock owned by her. 280 F.Supp. at 121.

A characteristic of most conspiracies to effect illegal ends, such as the one with which we are now concerned, is that peripheral members, or even those just below the prime movers, will not hesitate to chisel off relatively small emoluments for their personal profit, while at the same time furthering the objects and purposes of the high command. Johnson learned from Whitney that Freeman on behalf of his friend and client White was willing to pay $10,000 for control of Utah Fortuna. So the whole Salt Lake City crowd—K. Ralph Bowman, Richard Whitney, Johnson, Donald Glenn, and Richard Whitney's brother Frank Whitney—engineered an elaborate series of more or less contemporaneous transactions as a result of which White and his nominee Sonia Starr wound up with one million shares of Utah Fortuna,[4] for

4. Control did not pass directly from South Utah Mines, Inc. to White. On April 20, 1967 Johnson, purporting to act on behalf of the Board of Directors of South Utah, gave Richard Whitney a ten-day option to purchase 1,202,000 shares of Utah Fortuna Gold Co. stock for $4,750.00. The option was given without considera-

tion from Whitney. On April 26, 1967 the Board of Directors of South Utah unanimously passed a resolution authorizing Johnson to sell to Richard Whitney the 1,202,290 shares of Utah Fortuna Gold Co. stock owned by South Utah. On April 27, 1967 Richard Whitney exercised the option of April 20. On the same

which White paid $10,000; Mrs. McGarry received a paltry $500; and Bowman, the two Whitneys, Johnson, and Glenn divided up most of the balance of the cash together with 100,000 shares of Utah Fortuna stock each to Glenn and Frank Whitney, which they chose to describe as "finder's fees." It may well be that the initial option to Richard Whitney and the sale from Richard Whitney to White were designed to insulate White from Mrs. McGarry, who came out a poor last in the distribution of the $10,000 paid by White. But this is by the way.

This little byplay, however, has significance not only because it ties each and every one of the participants into the scheme to help White to get control of Utah Fortuna, but also because it ties these same individuals in with White and Freeman in connection with the campaign of Richard Whitney, Johnson, and Bowman beginning on April 24, 1967 to acquire the remaining shares of Utah Fortuna, held by the minority stockholders, and to funnel these shares to two Toronto brokerage houses designated by White and Freeman. The proof is explicit that Freeman advised Bowman by telephone from Toronto that any shares acquired by him would be purchased by the firm of J. P. Cannon & Co., Ltd. of Toronto, and White told Richard Whitney that if he was able to buy any stock he should call J. P. Cannon & Co., Ltd. or Lars Hagglof & Co., Ltd. in Toronto, which would purchase it. Such was the zeal of the Salt Lake City participants in the over-all scheme that before White actually acquired control by the purchase from Richard Whitney of the one million shares on April 27, 1967, they had purchased for nominal sums from the minority stockholders no fewer than 188,-500 shares of Utah Fortuna which, with the two 100,000-share allotments to Frank Whitney and Donald Glenn, came to a total of 388,500 shares, all acquired in anticipation of the acquisition of control by White on April 27, 1967. After April 27, 1967 other shares were acquired by the same participants, which by June 27, 1967 brought the total number to 753,000 shares. Every one of these shares wound up, as planned, with J. P. Cannon & Co., Ltd. and Lars Hagglof & Co., Ltd.; and they were all promptly registered in the names of close friends and relatives of the principal schemers. A large number of these shares were traced to sales on the over-the-counter market in New York City, and the first transaction after the stock appeared in the Pink Sheets was a sale of 25,000 shares "from the Toronto account in the name of Naft's wife, Corinne White." No amount of denials or so-called explanations by individual defendants on the witness stand could possibly convince any rational person that this series of events was purely coincidental and not by the design of those whom the SEC seeks to restrain. And so we come to another key finding (280 F.Supp. at 115–116):

By June 27, 1967, as a result of the foregoing transactions, approximately 96.8% of the 1.8 million shares of North American outstanding was thus under the control of the White-Freeman-Naft trio, including the 1 million shares held by White and his friend Sonia Starr, and the 753,000 shares acquired through Cannon and Hagglof held in the names of friends and relatives of the trio. The Court is convinced from the proof of all of the surrounding circumstances, including the systematic acquisition of the stock, the close relationship between the trio and the parties in whose accounts the stock was held in Toronto and the subsequent distribution of the shares, that the 753,000 shares were acquired in Toronto with a view to the distribution of all or a very substantial portion of it in the United States.

As we have already observed, the timing and execution by the various participants were precise and effective. We shall see that all these knowledgeable and experienced persons, many of whom had already been enjoined by the SEC for

day he transferred control of Utah Fortuna to White and his nominee, Sonia Starr, by selling 1,000,000 of his newly acquired shares to them for $10,000.00.

their participation in other illegal stock fraud transactions, knew the value of prompt and almost instantaneous action in order to produce the desired results. So, we shall now return to intervening events.

White had no sooner reached Salt Lake City to complete the one-million share control transaction than it was discovered that Bowman was the President and controlling stockholder of a certain Thermal Dynamics Corp., and Richard Whitney was Thermal's Secretary. This company owned a Pilot Plant at Helper, Utah that had not been in operation for almost three years. White had previously intended to transfer certain Canadian mining claims to the "shell." But he no sooner learned that the Thermal plant had been built to test the feasibility of producing pollution-free coke under an unpatented procedure known as the Storrs Process, to which Thermal Dynamics had the exclusive United States rights, than he saw "a prospect that would be more appealing to the imagination of prospective over-the-counter traders in the stock." The sale of control of Utah Fortuna to White took place on April 27, 1967, as we have already seen. The next day, April 28, saw White and Naft in Helper, Utah, verifying the possibilities of the Thermal Dynamics process and Pilot Plant. The result was that, a mere three weeks later, on May 19, 1967, the name of Utah Fortuna was changed to North American Research and Development Corporation, effective at a stockholders' meeting held on June 19, 1967; and White entered into an agreement with Bowman for the purchase by North American of all Thermal's assets, including its interest in the Storrs Process, for 330,000 shares of North American, plus a royalty on the coke produced by the process. Consistent with his original intentions, on May 26, 1967 White transferred to North American some unpatented copper mining claims located in the Northwest Territories of Canada which were purchased from Robert Rosenblatt for another 200,000 shares of North American stock (which were never de-livered or issued). We need not describe these claims further than to say that there was little to show that they had any real value or substance. This and other subjects are treated so effectively and accurately in Judge Mansfield's opinion that we make no elaboration in this opinion.

Everything had gone according to schedule, and the time had come for touting the stock in preparation for its appearance in the Pink Sheets. So White and Lewis Dillman, an American-citizen colleague of White's who lived in Canada and had become President of North American, collaborated on the preparation of a "Progress Report to the Shareholders." Supposedly prepared for distribution to the stockholders, who numbered fewer than one hundred, such was the industry and expedition of White and Dillman that one thousand copies of the Progress Report appeared in early July, 1967; and many of them promptly found their way to various brokerage houses in the United States. In the meantime, according to statements by defendants' counsel, the stock was traded in Canada. But Judge Mansfield held that none of these statements was "supported by reliable proof."

The Progress Report is a slick piece of work, but not slick enough. Judge Mansfield's characterization, which we approve, will suffice (280 F.Supp. at 117):

> The "Progress Report," without providing any financial information, conveys the impression that North American was well capitalized and ready to continue profitable operation of its pilot plant to meet a large market demand, with a program for locating processing plants in or near coal mining centers, which would be either "directly owned" by it or "by others under a leasing or royalty agreement."

The finding that the Progress Report was misleading and its distribution by the use of the mails or any means or instrumentality of interstate commerce a clear violation of Rule 10b–5 is supported by an abundance of proof, discussed in Part III of this opinion, and we find

no basis upon which we could reject the finding as clearly erroneous.

Thus the stage was set for the introduction of the stock into the United States. White, Freeman, and Naft were personally active traveling about, talking to a number of broker-dealers in the United States, touting the stock and stirring up a demand in key cities of the United States "with a view to having the stock open up for trading on the over-the-counter market in the United States on or about June 27, 1967." 280 F.Supp. at 117. The details are set forth in Judge Mansfield's opinion and need not be repeated.

One of the firms visited by White in June, 1967 was Bateman Eichler, Hill Richards, Inc. of Los Angeles. An employee of that firm was a companion of White on this visit; and she testified, in the words of Judge Mansfield's opinion (280 F.Supp. at 118):

to conversations between White and Freeman in which, when Freeman stated that they would get the market price of the stock up to $100 a share, White countered that they could not take up the price of the stock that high for the reason that if they did so they would have the "SEC on their neck", and "That they were going to take it slowly up to $10. That it can't move too fast because it was bad for a stock to move too fast." Although certain testimony given by Miss Cannon and other witnesses was contradicted by White, after careful observation of the witnesses I find their testimony to be credible and reject that given by White.

Wellington Hunter, a Jersey City broker-dealer, was induced by White and Naft to quote North American shares in the Pink Sheets, beginning on June 27, 1967 at $2¼ bid, $2¾ offered. It is easy to guess who made up these fractional figures out of thin air. So the upgrade of the stock commenced, stimulated by most of the broker-dealers who had been approached by White and his emissaries. Had it not been for the prompt and effective action of the SEC in issuing a Stop Order on July 20, 1967 and in promptly moving for injunctive relief, the predictions made by White and Freeman might have come true with disastrous results.

In our forthcoming discussion of the controlling legal principles, we must consider separately the violations of Sections 5(a) and (c) of the Securities Act of 1933 and the violations of Section 10(b) of the Securities Act of 1934, together with Rule 10b–5.

## II.

### The Illegal Distribution of Unregistered Stock

All the dealings in North American stock described in the introductory part of this opinion involved transfers of unregistered stock. Despite the fact that North American's (Utah Fortuna's) stock was first issued "prior to or within sixty days after May 27, 1933," it is perfectly plain to us that the exemption from registration set forth in Section 3(a) (1) of the 1933 Act is not applicable.[5] The substance of the transactions as a result of which 1,200,000 shares of Utah Fortuna stock were transferred to White and his nominee Sonia Starr (1,000,000 shares) and to Frank Whitney and Donald Glenn (100,000 shares each) plus the 553,000 additional shares that found their way into the Toronto accounts, was

5. See H.R.Rep. No. 85, 73d Cong., 1st Sess. 14 (1933) ; Wonneman v. Stratford Securities Co., [1957–1961 Transfer Binder] CCH Sec.L.Rep. ¶ 91,034 (S.D.N.Y. 1961) ; SEC v. A. G. Bellin Securities Corp., 171 F.Supp. 233 (S.D.N.Y.1959) ; SEC v. Saphier, 1 S.E.C. Judicial Decisions 291, 293 (S.D.N.Y.1936); Ira Haupt & Co., 23 S.E.C. 589, 599–600 (1946); 1 L. Loss, Securities Regulation 559, 708–10 (2d ed. 1961) ; accord, United States v. Schwenoha, 383 F.2d 395 (2d Cir. 1967), cert. denied sub nom. Suess v. United States, 390 U.S. 904, 88 S.Ct. 815, 19 L.Ed.2d 869 (1968) ; cf. United States v. Benjamin, 328 F.2d 854, 857, 863 (2d Cir.), cert. denied sub nom. Howard v. United States, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

a "new offering" within the meaning of Section 3(a) (1), which provides "but this exemption shall not apply to any new offering of any such security by an issuer or underwriter subsequent to such sixty days" after May 27, 1933.

The trial judge seems to have attributed undue significance to the date of April 27, 1967 when control passed to White. Thus, although he held that the secondary distribution of the 388,500 shares constituted a violation of Section 5 "regardless of whether White acquired a beneficial interest in those shares," he further held that Lars Hagglof's transactions involved shares purchased after April 27, 1967 and that the total number of the 364,500 shares sold to the Canadian accounts after April 27, 1967 were entitled to a Section 3(a) (1) exemption. He did this with some reluctance and "for the purposes of preliminary relief only," assuming that further protracted hearings were necessary to cover the transfers after April 27, 1967. We think this is an unduly restrictive view and one which is inconsistent with the findings we have already approved as not clearly erroneous. There was in fact no occasion for any further hearings. The joint action of the Toronto group on the one hand and the Salt Lake City group on the other had been thoroughly exposed to the light and included in appropriate findings.

Our holding is that in cases where such joint action is proved the beneficent purposes of the securities acts for the protection of investors and in the public interest can be accomplished only by treating such new distributions as jointly conceived and jointly consummated. Naturally enough this encompasses a considerable amount of "aiding and abetting" on the part of individual participants, whose conduct we hold properly to be subject to injunctive relief at the behest of the Securities and Exchange Commission. See SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959); cf. Gross v. SEC, 418 F.2d 103 (2d Cir. 1969) (Moore, J.). No part of the stock purchased and distributed by the co-conspirators was entitled to a Section 3(a) (1) exemption. It is quite immaterial that White did not distribute to the public any part of the 1,000,000 shares he and his nominee Sonia Starr acquired on April 27, 1967.

It will further clarify the situation if we trace the development of the scheme in terms of who were "issuers" and who were "underwriters," for the Securities Act of 1933 established a series of specific enactments and definitions so interrelated and integrated as to protect the investing public from the detrimental effect of the dissemination and distribution of unregistered securities. At the very center of this legislation is the provision that any security may be registered with the Commission by the filing of a registration statement in compliance with Section 6. The supplementary provisions and definitions are so designed as to prevent any circumvention of the registration requirement by devious and sundry means. This is one of the reasons for the broad and liberal interpretations the courts have uniformly given to this particular phase of the Securities Act of 1933.

The general provisions making it illegal for "any person" to sell unregistered securities "through the use or medium of any prospectus or otherwise" or to carry or cause to be carried any such unregistered securities through the mails or in interstate commerce "for the purpose of sale or for delivery after sale" are contained in Section 5(a) of the Securities Act of 1933. Section 5(c) makes it illegal for "any person" to offer or sell or offer to buy such unregistered securities by making use of the mails or any form of communication in interstate commerce. These sections, of course, cover all the shares of stock involved in this case, as it is established beyond dispute that no registration statement was ever filed with the Commission.

The effect of this is to cast upon the defendants the burden of showing that for some reason Sections 5(a) and (c) do not apply to them. See, e. g., SEC v. Ralston Purina Co., 346 U.S. 119, 126–

127, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); SEC v. Culpepper, *supra*, 270 F.2d at 246; Gilligan, Will & Co. v. SEC, 267 F. 2d 461, 466 (2d Cir. 1959); cf. SEC v. Chinese Consolidated Benevolent Association, 120 F.2d 738, 741 (2d Cir.), cert. denied, 314 U.S. 618, 62 S.Ct. 106, 86 L. Ed. 497 (1941).

▆ We have already demonstrated that the exemption provided in Section 3 (a) (1), relied on by appellants, is not applicable because we are dealing here with "a new offering." A careful scrutiny of the supplementing provisions and definitions will disclose that the defendants are all included as issuers or underwriters and hence can find no comfort in the Section 4(1) exemption intended to cover everyday trading between members of the investing public, that is to say "transactions by any person other than an issuer, underwriter or dealer." It will suffice to say that none of the other terms of Section 4(1) is applicable. In other words, Section 4(1) leaves subject to Section 5 all transactions that involve an "underwriter." In turn, the term "underwriter" is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an "issuer" to the public; and for this purpose the term "issuer" is defined to include not only the issuer but also affiliates or subsidiaries of the issuer and "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

It would take a pretty smart operator to conceive of a scheme to unload unregistered shares upon the public without exposing himself and those participating with him, aiding and abetting or otherwise joining in the common effort, to the operation of the injunctive and other powers of the SEC and the federal courts. Therefore, we start with Johnson as an "issuer" because of his control of Mrs. McGarry, who in turn controlled Utah Fortuna which later became North American Research and Development Corporation. See SEC Rule 405(f), 17 C.F.R. Section 230.405(f) (1970); Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269, 275–276 (10th Cir. 1957); Newberg v. American Dryer Corp., 195 F.Supp. 345, 354 (E.D.Pa.1961); Zachman v. Erwin, 186 F.Supp. 681, 685–686 (S.D.Tex.1959). Johnson remained an "issuer" until control passed to White on April 27, 1967. In the meantime Johnson acted as an "underwriter" in connection with the two 100,000-share blocks of stock he transferred to Frank Whitney and Donald Glenn. Johnson scurried about to secure the 188,500 shares which he sold to Bowman and Richard Whitney. When the latter two funneled these shares into Cannon in Toronto, Bowman and Whitney each was acting as an "underwriter," as were Frank Whitney and Glenn when they followed the same course with the shares they received as a "finder's fee."

When, after April 27, 1967, control had passed to White, the same individuals, for the same purposes, acquired the additional 364,500 shares of Utah Fortuna stock and funneled them into Hagglof, all of them, including Johnson, acted as "underwriters." Because the entire 753,000 shares in the Canadian accounts, representing practically all of the outstanding shares of the corporation were, as Judge Mansfield found, "acquired in Toronto with a view to the distribution of all or a very substantial part of it in the United States" this was patently an unlawful secondary distribution; and appellants White, North American, and Bowman were each properly enjoined.

As this opinion and the opinion below indicate, White was the central force behind the scheme pursuant to which the stock of North American was to become widely distributed in the United States.[6]

6. With respect to the purchase of control on April 27, 1967, White was an underwriter because he purchased the shares from an issuer (South Utah and, ephemerally, Richard Whitney) with a view to distribution. The facts of the instant case bear a remarkable similarity to those in SEC v. A. G. Bellin Securities Corp., 171 F.Supp. 233 (S.D.N.Y.1959), in which the purchaser of the controlling shares of

After April 27, 1967, he was the controlling person of Utah Fortuna, later North American, and as such violated Section 5 if he caused the distribution of unregistered shares. It matters not that none of the shares he owned was sold in the United States; as the man clearly in control of the Canadian group whose shares found their way into this country, his interest in and impetus behind the scheme were sufficient to make the granting of a preliminary injunction against him legally unassailable. See SEC v. A. G. Bellin Securities Corp., 171 F.Supp. 233 (S.D.N.Y.1959); cf. SEC v. Boren, 283 F.2d 312 (2d Cir. 1960).

North American also was an issuer and, after April 27, 1967, was nothing but a corporate embodiment of White. It acted solely at his direction, and he was completely in command. The distribution of the Progress Report through the mails and facilities of interstate transportation, the transfer of unregistered shares on its books, and the intensive promotion and distribution of the shares by White and all his cohorts until the SEC stopped trading, are enough to make the granting of a preliminary injunction against North American proper. See SEC v. Micro-Moisture Controls, Inc., 148 F.Supp. 558 (S.D.N.Y.1957); cf. SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248 (D.Utah 1958) (permanent injunction).

Bowman testified that after he learned that White was the prospective purchaser of the controlling shares of Utah Fortuna but before April 27, 1967, he discussed the desirability of purchasing shares from minority shareholders with Richard Whitney. Both agreed that the idea was good, and Whitney acquired a list of shareholders from Johnson. However, it was unnecessary for either Bowman or Whitney actively to solicit the small shareholders because Johnson was doing this work assiduously between April 24 and April 27, and he sold the 188,500 shares he thus acquired to them. Pursuant to their conversations with White and Freeman, all of these shares, together with the 200,000 shares transferred to Frank Whitney and Donald Glenn as a "finder's fee," were sold to J. P. Cannon & Co., Ltd. Cannon purchased the shares in accordance with instructions given on April 24 by Freeman and Naft.

The court below found that Bowman's explanations were inadequate. Realistically it cannot be said that when Bowman asked Freeman whether Freeman thought a market would exist in Canada for any of the shares he purchased, he thought that they would be traded exclusively outside the United States. Bowman was a person of considerable experience in the securities business, which, although it sometimes got him into trouble with the SEC,[7] was still valuable in evaluating deals such as White's. Moreover, he specialized in the trading of penny stocks. It would not be unreasonable to infer that a man of his experience, knowing that a United States promoter with extensive Canadian interests was looking for a public corporate shell located in the United States, realized or should have realized that the promoter's objective was to float stock of little value in the American securities market at inflated prices by stimulating an artificial demand for shares which he had safely stashed away in Canada, a country whose own securities market offered little comparative potential. The finding that Bowman pur-

---

a corporate shell likewise was held to be an underwriter for that purchase in a preliminary injunction proceeding.

7. Bowman had been Vice-President and director of Ned J. Bowman Corp. That company was enjoined from violating Section 5 of the Securities Act of 1933 in respect to sales of Lavender Uranium Corp. stock, and its registration as a broker-dealer was revoked. In the in-

junction proceeding there were findings that Bowman and his brother, Ramon C. Bowman, violated Sections 5 and 17(a) of the Securities Act of 1933.

On January 26, 1965, a judgment by consent was entered by the United States District Court for the District of Utah against Bowman and Thermal Dynamics Corp. permanently enjoining them from violating Sections 5 and 17(a) of the Securities Act of 1933.

chased shares from Johnson with a view toward their eventual distribution in the United States was not clearly erroneous. See SEC v. Mono-Kearsarge Consolidated Mining Co., *supra*, 167 F.Supp. at 252, 255–256; Sec. Act Rel. No. 4708, 29 Fed.Reg. 9828 (1964); 4 L. Loss, Securities Regulation 2407–08 (1969); 1 Id. 369 (2d ed. 1961); cf. Morris Mac Schwebel, 40 S.E.C. 347, 366, 369–370 (1960).

Although Bowman's purchases from minority shareholders after April 27, 1967, all of which were funneled to the White-Freeman-Naft trio by sales to Hagglof between April 28 and June 5, 1967 [8] were not from issuers, they were made with "a direct or indirect participation" in White's distribution scheme. During the five and one-half weeks between April 27 and June 5, Bowman's business relationship with White became progressively closer. Even if Bowman did not actually realize what White was up to before April 27, the latter's intentions became crystal clear after he obtained control, when he purchased the Pilot Plant and exclusive United States rights to the Storrs Process from Thermal Dynamics (which Bowman dominated) and then the unpatented Canadian copper mining claims from Rosenblatt, all of which were used to dress up the corporate shell of North American.

Even though Bowman's sales to Hagglof ended on June 5, it is reasonable to expect that he, together with White and North American, would resume his conduct to further the success of the scheme if the opportunity presented itself had the SEC not stepped in and stopped trading. Consequently, the SEC's action in seeking an injunction against Bowman, and the District Court's action in granting preliminary relief, were both proper. See Section 20(b) of the Securities Act of 1933, 15 U.S.C. Section 77t(b); SEC v. Culpepper, *supra*, 270 F.2d at 249–250; SEC v. Okin, 139 F.2d 87, 88 (2d Cir. 1943); SEC v. Franklin Atlas Corp., 154 F.Supp. 395 (S.D.N.Y.1957).

## III.

### *The Violations of Section 10(b) and Rule 10b–5 by White, North American and K. Ralph Bowman*

The District Court preliminarily enjoined North American, White, and K. Ralph Bowman from violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. Section 240.-10b–5 (1970) in connection with the purchase, offer or sale of the common stock of North American.[9] This segment of the case evolves from the distribution of the Progress Report, purporting to describe the newly acquired Storrs Process, the Pilot Plant at Helper, Utah, the potential marketability of pollution-free fuels, and the efforts being exerted by

8. During this period Bowman sold 164,500 shares of Utah Fortuna (North American) common stock to Hagglof in the names of his wife, Norma C. Bowman (150,000 shares) and his father-in-law, Albert W. Conrad (14,500 shares). Moreover, Bowman admitted that he was acting jointly with Richard Whitney in the trading of the stock after April 27, 1967. Therefore, the sale by Whitney of 150,000 shares to Hagglof, all in the name of his wife, Abby B. Whitney, from their joint account with Lindquist Securities, can also be attributed to Bowman.

9. The motion of the SEC for a preliminary injunction also requested relief under Section 17(a) of the Securities Act of 1933, 15 U.S.C. Section 77q(a) (1964). This section was among the anti-fraud provi-

sions which Judge Mansfield's opinion held to have been violated. However, the order appealed from is a verbatim rendition of Rule 10b–5, except that it includes the "offer" of any security within its ambit, a term found in Section 17(a) but not Rule 10b–5, and limits the prohibition on acts, practices, or courses of business which operate or would operate as a fraud or deceit to "purchasers and prospective purchasers," a larger group than "purchasers" in Section 17(a) but narrower than "persons" in Rule 10b–5. Although these are not significant textual variations, there are other variations between Section 17(a) and Rule 10b–5 which may be significant, and we limit our discussion of the anti-fraud provisions to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.

North American to secure a substantial position in this developing market.

## A.

### *The Progress Report Was Materially False and Misleading*

■ The Progress Report exuded great optimism; the impression sought to be conveyed was that the sky is the limit in the pollution-free fuel market, that the Storrs Process was a panacea for public utilities and other large users of coal, and that North American was planning a nationwide system of either directly owned plants or plants owned by other companies under lease or royalty agreements, to cash in on the expected bonanza. However, North American was hardly in the financial position to make good on the ambitious plans that the writers of the Progress Report had described so vividly, and the management did not contemplate North American's owning such a system of plants.[10] Moreover, as is pointed out in Judge Mansfield's opinion, 280 F.Supp. at 129, the commercial feasibility of the Storrs Process itself had not been determined. The statements in the Progress Report about the commercial feasibility of the Pilot Plant were based on an incomplete engineering study conducted in 1965 which was obsolete by June, 1967. A new study, consisting of a trial run lasting 30 days, was necessary, and would cost a considerable amount to undertake. In fact, the only witness—even among the defendants—who was sure of the prospects of the process and Pilot Plant was K. Ralph Bowman. His credentials and expertise in engineering and other fields relevant to an intelligent evaluation of the commercial feasibility of the Storrs Process were singularly unimpressive.

Nevertheless, for all of its optimism, the Progress Report was written in such a way as to attempt to protect the flanks of its authors. For example, despite the photographs taken late in 1964 showing the Pilot Plant buzzing with human activity and the initial description of the plant as a "fully operating pilot plant" (the plant had lain dormant since late 1964), the Progress Report described it as one "which we proposed to put into production at an early date." The meaning of this phrase is ambiguous, and deliberately so. To add to the ambiguity, the plant was described as "experimental" in a caption to one of the photographs.

The Progress Report contained other equivocal statements. Among them was one which indicated that North American intended to conduct further production tests to "enable your company to *verify* the commercial value of its process" and another that "[w]ith further research and development, your Company's process *could* prove to be of significant value" (emphasis added). Judge Mansfield was correct in finding that these statements conveyed the impression that any further tests would be in the nature of *pro forma* review. They should be compared with accompanying statements: that the limited "feasibility studies" previously undertaken "have indicated that a profitable operation can be anticipated by use of this process and the production of coke and the oil by-product"; that on the basis of these further tests "which we are confident will mark a major advance in the production of a smokeless, desulfurized fuel" the process will be marketed on a royalty (or other) basis; and that "[i]ndependent tests and appraisals of the Thermal Dynamic process by leading engineering firms, have indicated

10. Each new plant would cost at least $400,000 to $500,000 to construct. On July 31, 1967 North American possessed cash of $45,599, of which approximately $31,000 would be required to undertake the thirty-day engineering study of the commercial feasibility of the Pilot Plant. Its other assets, exclusive of those it ac-

quired from Thermal Dynamics Corp. and Robert Rosenblatt, consisted of office equipment of $1,770 and prepaid expenses and deposits of $297. Furthermore, the 1965 study estimated that it would cost $167,000 to transform the Pilot Plant for commercial use.

that there is a very large potential for the sale of this type of coke, the more so because of its non-pollutant qualities." [11]

In addition to its ambiguities, the Progress Report contains statements which are half-truths. For example, the first sentence indicates that North American has acquired the patents to the Storrs Process. The Storrs Process had not been patented, although Bowman testified that Storrs had transferred to Thermal Dynamics pending patent applications. All that Thermal Dynamics received from Storrs were the exclusive United States rights to the Process. Moreover, there were indications that there were many similar processes for reducing the pollution content of coal although, of course, none did exactly what the Storrs Process claimed to accomplish. Thus, if the Storrs Process was patentable it would by no means assure North American undisputed mastery of the pollution-free coke market.

The statement that Dr. Berg would continue to direct the Helper plant served to create more firmly in the mind of the reader the impression that the plant was in full operation and that all that occurred was a mere change of ownership. No person reading this statement could know that Dr. Berg could not have had anything to do with the plant during the almost three years in which it had not operated (although he remained an officer of Thermal Dynamics) and that, despite its ownership of the plant and exclusive United States rights to the Storrs Process, Thermal Dynamics was virtually bankrupt when it sold its major assets to North American.

The references to the conclusions of "Market Research Studies" and "feasibility studies," without any explanation of the procedures the researchers employed and the data on which their conclusions were based, made it impossible for the shareholder, much less the independent investor or speculator, to evaluate the prospects of the corporation with anything other than his intuition or his own sources of market information. In the case of a corporation which only two months before the publication of the

---

11. The tone of these statements should be contrasted with the Notes to the Balance Sheet of North American, issued on August 18, 1967. We quote the pertinent portions of these Notes as follows:

1. On June 20, 1967, the Company purchased from Thermal Dynamics Corporation an experimental plant located at Spring Canyon, Utah (carried by the Company at appraised value of $451,-350), patent applications and license agreements (carried by the Company at estimated value of $5,000), and rights under a lease agreement (no value assigned by the Company), for 330,000 shares of its capital stock and assumption of a mortgage payable * * * and a royalty agreement for future raw material processed using certain patented processes. * * * Appraised and estimated values were used as a basis of valuation for the experimental plant and patent applications and license agreements, respectively, as the fair value of the 330,000 shares of the Company's capital stock was not reasonably determinable.

Because of the nature of the experimental plant, and its intended future use, the recovery of the Company's investment in this facility and related items is dependent on future profitable operations and the successful development of processes having commercial value. These assets are not being utilized at the present time. It is contemplated that the experimental plant will be subjected to a feasibility study to determine the commercial value of processes. If the study so indicates, the Company intends to recover the investment in the plant through licensing of the processes on a royalty basis.

\* \* \* \* \*

3. \* \* \*

The Company's experimental plant is located on leased premises. The lease agreement, dated May 21, 1964, provides for annual rentals of $660 for an initial term of one year, with a renewal option for an additional five years at the same annual rental.

A suit has been filed by the developer of a patent licensed to Thermal Dynamics Corporation and now owned by the Company which asks for a termination of the license. In the opinion of the Company's legal counsel, the complaint is without merit.

Progress Report had been but a shell and now sought to enter an untested market, outside sources of information must have been few and far between.

Finally, no financial statements accompanied the Progress Report.[12] Without them no reader could be aware of the precarious financial position of North American; its lack of revenue; its utter inability to finance the expansion and research which the Progress Report confidently contemplated; its failure to attract the backing of corporations with financial, technological, and managerial resources sufficient to make the prospects a reality; and the inability of independent auditors to determine the fairness of the balance-sheet presentation of its major assets.

It is to state the obvious that the Progress Report lacked the specificity and objectivity required of a prospectus. We conclude that the inflation of North American's prospects in the pollution-free fuel field, coupled with the failure to include financial data and the deliberate use of ambiguities and half-truths rendered the Progress Report materially false and misleading. See SEC v. Great American Industries, Inc., 407 F.2d 453, 456–458 (2d Cir. 1968) (in banc), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L. Ed.2d 237 (1969); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 866 (Friendly, J., concurring), 869–870 (Hays, J., concurring in part and dissenting in part) (2d Cir. 1968) (in banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); cf. Fleischer, Securities Trading and Corporate Information Practices: The Impli-

cations of the Texas Gulf Sulphur Proceeding, 51 Va.L.Rev. 1271, 1292–95 (1965.)

## B.

### White, North American, and K. Ralph Bowman Were Properly Enjoined from Violating Rule 10b–5

Although there were fewer than one hundred shareholders of North American at the time the Progress Report was published and, as we have seen, the Salt Lake City crowd was striving to reduce this number still further, one thousand copies of the Report were prepared. Many of the extras found their way to stockbrokers. For example, in July, 1967, White mailed approximately 35 to 50 copies of the Progress Report to Howard Alweil, then the Manager of the Beverly Hills office of Bateman Eichler, Hill Richards, Inc. The copies were mailed in response to Alweil's queries about North American, queries which were generated by White's promotion of the stock and tips about the commencement of trading via long-distance telephone calls and personal appearances in California for the purpose of promoting the shares, made possible by taking interstate airline flights.

On these trips to California, White did not always rely upon the Progress Report; he often used his persuasive talents and apparent enthusiasm for the corporation to interest brokers (and through them their customers) in the stock of North American. An illustration of this technique can readily be found in White's visit to the office of

12. When financial statements were prepared, after the publication of the Progress Report, they were accompanied by a disclaimer of opinion by North American's independent auditors, Haskins & Sells, a national firm of Certified Public Accountants:

> As explained in Note 1 to the balance sheet [see footnote 11, *supra*], it is contemplated the Company's assets shown on the balance sheet as "Experimental plant", and "patent application and license agreements" are, in major part, to be the subject of a feasi-

bility study, with any eventual recovery of the Company's investment to be effected through the collection of royalties under licensing agreements with those who might use the Company's processes. Because the eventual recovery of the investment in these assets and in "mining claims" is not presently determinable, we are unable to express an opinion on these assets and, because of their materiality, do not express an opinion as to the accompanying balance sheet taken as a whole.

Joseph Klein, Manager of the Beverly Hills office of Bache & Co., between June 24 and 28, 1967. White walked in, rolled a piece of coke on Klein's desk which he implied came from the Pilot Plant, and proceeded to tell Klein of the "tremendous" situation awaiting purchasers of North American common stock. White stated that he was going to run the company himself and was working with Parsons Engineering, a respected engineering firm, to determine the commercial feasibility of the Storrs Process. The latter statement was untrue at the time it was uttered. Although Klein forbade White to talk about the stock in the office until Klein was supplied with financial information and data about the feasibility of the process and registration of the shares, he said to White, "Eddie, as far as I am concerned I may buy a hundred or two hundred shares of this myself * * *." Klein did in fact purchase 300 shares for his own account on June 27, 1967.

White also showed copies of the Progress Report and promoted the stock to other persons whom he characterized as friends.

K. Ralph Bowman, the President and controlling stockholder of Thermal Dynamics Corp., supplied the photographs which appeared in the Progress Report. Furthermore, he knew that the Pilot Plant had not been in operation for almost three years. The Progress Report listed Bowman as a director and Secretary-Treasurer of North American, and in his affidavit in opposition to the SEC's motion for a preliminary injunction he stated the following:

My only connection with the preparation of this report was the submission to the Company of all of the reports, photographs and other documentary evidence which had been acquired by Thermal-Dynamics Corporation in the seven years that it had been working on the development of this process. All of the information which I submitted to the Company was verified and factual. *Although I did not have an opportunity to review the report as it finally was written,* I believe that the report states fairly the problems of air pollution in the United States and the description of the process which was acquired from Thermal-Dynamics Corporation. As I understand it, the purpose of the report was to inform stockholders of this acquisition and was not intended in any way as a selling document. Certainly, I did not buy or sell any stock in North American after the publication of that document nor did I have any interest in any purchases or sales which might have been made subsequent to June 30, 1967, the date of the report (emphasis added).

Because we find that the purpose of the dissemination of the Progress Report was to induce the investing public, either directly or through the inducement of stockbrokers, to rely on its representations and, so relying, to purchase the stock of North American from the persons in Canada who had acquired almost all of the outstanding shares—i. e., the White-Freeman-Naft triumvirate and their relatives and friends—the requirement of Rule 10b–5 that false and misleading statements be employed "in connection with" the sale of securities clearly has been met as against White, North American, and Bowman.

The case to which we must turn initially for guidance is the landmark opinion of Judge Waterman in the in banc decision in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). There it was held that Rule 10b–5 is violated by the corporation and its management "whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, e. g., by means of the financial media * * * if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes." *Id.* at 862. The exception to

this rule is found if corporate management demonstrates that it was diligent in ascertaining that the information published was the whole truth and that such diligently obtained information was published in good faith.

In the instant case it is clear that the requirements which would put the exception into operation were not met. On the contrary, the actions of White and Bowman are precisely the opposite of diligence and good faith in dissemination. Since the corporation here was little more than the personification of White and his colleagues and could take no action different from that which they dictated, there is no question but that the corporation also failed to exercise due diligence in ascertaining the truth of the statements contained in the Progress Report. It must be recalled that White himself was unsure of the commercial feasibility of the Storrs Process. If it lay within the discretion of the trial judge to enjoin the Texas Gulf Sulphur Company on the basis of the statements contained in its press release, the issuance of the Progress Report by North American presents an *a fortiori* case. It matters not that the corporation itself did not disseminate copies of the Progress Report to persons other than shareholders; once the document was published the Corporation could not abdicate responsibility for its transmission to persons not shareholders by claiming that it, apart from White and his friends, intended the report for the eyes of shareholders only.[13] Furthermore, in view of the fact that some independent minority shareholders remained, the glowing promise of boom times ahead could reasonably be calculated to induce them to increase their holdings, a prospect not inconsistent with White's desire to promote public acceptance of the stock and to push the price as high as the traffic would bear.

The activities of White and Bowman, insiders of North American, with respect to the Progress Report, have already been described and they also were properly enjoined. Quite apart from his touting the stock to brokers, an act which widened the inequality of information between the insider and the public, White also promoted the stock verbally to friends, asserting that these incidents were no more harmful than the innocent stock tip. We disagree with this contention. In the first place, White was not an ordinary tipper: he was in control of North American. Secondly, the very purpose behind these tips was not merely to confer a benefit upon friends and relatives (such as his mother-in-law and a man with whom he grew up) but to effect the public distribution of unregistered shares on the basis of false and misleading assertions

13. See SEC v. Texas Gulf Sulphur Co., *supra,* 401 F.2d at 863–864. This is not a "once-in-a-lifetime" case concerning which Judge Friendly has reservations about the wisdom of granting injunctions. See *id.* at 868–869.

Furthermore, because the SEC seeks injunctive relief only, we do not reach the question of the possible civil liability of North American for damages, a problem to which Judge Friendly addressed much of his concurrence, and Judge Moore much of his dissent, in *Texas Gulf Sulphur.* There is no question but that the issuance of corporate press and other releases is beneficial to the investing public and is assiduously to be encouraged, whether the motive is to increase the store of corporate information available to the market or, as in *Texas Gulf Sulphur,* to squelch rumors and discourage wild specu-lation. It is also clear that there may often be a dilemma whether to issue a press release, and risk liability under Rule 10b–5 for furnishing information that is later found to be materially false and misleading, or not to issue one, and risk liability for nondisclosure. See *Id.* at 867, 881; Cary, Symposium, Insider Trading in Stocks, 21 Bus.Lawyer 1009, 1012 (1966); Fleischer, Federal Corporation Law: An Assessment, 78 Harv.L.Rev. 1146, 1157 (1965); Note, Civil Liability under Section 10b and Rule 10b–5: A Suggestion for Replacing the Doctrine of Privity, 74 Yale L.J. 654 (1965). However, none of these considerations is present in the instant case. The Progress Report was found to be a mere selling device and part of White's over-all scheme to dump the unregistered shares on the American market.

and, more importantly, omissions of material adverse facts about the corporation. It may be one thing to say to a friend that a particular stock is a good speculation although we express no opinion on the propriety of even these statements when made by someone in White's position, but they clearly fall within the intent of Rule 10b–5 when they are buttressed by purportedly factual assertions about the prospects of the company which are materially false and misleading in content or omission, to the extent that they are made with the assistance of interstate transportation and communication facilities or the mails. See SEC v. Great American Industries, Inc., *supra*, 407 F.2d at 460.

Bowman's conduct utterly disregarded the consequences of his actions in furtherance of the preparation of the Progress Report. It is difficult to understand how he could make statements about the fairness of its presentation if he did not review it. Since even White testified that he was not sure that the Storrs Process was commercially feasible and that considerable costly study was still required, Bowman's unbridled optimism, combined with his lack of experience and training in any of the relevant technical skills, demonstrated more than amply his recklessness in furnishing materials misleading in the context in which they were to be employed for the Progress Report, without attempting to have some say in the use to which they were put and in permitting his name to appear on the document without reading it before it was circulated. Cf. Model Penal Code Section 2.02(2)(c) (Proposed Official Draft 1962).

■ Even if it could be said that those on the receiving end of the subsequent promotional barrage were not directly influenced to purchase or sell shares of North American because of the Progress Report, we still think that Bowman's activities come within the scope of the Rule. Contrary to the assertion of Bowman's counsel, financial interest in shares traded or privity of contract is immaterial when the SEC seeks to execute its statutory mandate by bringing an action to enjoin reckless insiders such as Bowman from violating the prohibitions of Rule 10b–5. See SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 854–856; Ruder, Texas Gulf Sulphur —The Second Round: Privity and State of Mind in Rule 10b–5 Purchase and Sale Cases, 63 Nw.U.L.Rev. 421, 437–44, 446–47 (1968); Note, Scienter and Rule 10b–5, 69 Colum.L.Rev. 1057, 1060–61 (1969); cf. Cady, Roberts & Co., 40 S.E.C. 907, 913–15 (1961).

## IV.

*The Cross-Appeal With Respect to Lars Hagglof & Co., Ltd., Lewis Dillman, Alfred Blumberg, and Martin Orenzoff*

### A.

### *Section 5 Violations*

■ Preliminary injunctive relief was denied as to Lars Hagglof & Co., Ltd. on the assumption that the 364,500 shares sold to the Canadian accounts after April 27, 1967 were entitled to a Section 3(a)(1) exemption. We have already concluded that this assumption was improvidently made. The activities of Hagglof after April 27 in selling shares to brokers and dealers in the United States which it held for the White-Freeman-Naft trio and their cohorts put it squarely within the scope of Section 2(11) as an underwriter.[14]

---

14. In any event, there is no question but that Lars Hagglof & Co., Ltd. acted as a "dealer," under Section 2(12), i. e., a person who engages "either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." Consequently, under Section 4(1) it would not be entitled to transactional exemptions. The exception in 4(3)(A) to the exemption under Section 4(3) is applicable because both Hagglof's buying and selling transactions on behalf of the White-Freeman-Naft trio and their confederates took place before the

See, e. g., United States v. Re, 336 F.2d 306, 309 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964).

Even so, however, as we have been informed that Lars Hagglof & Co., Ltd. may have gone out of business on October 31, 1967 and there may be mitigating circumstances of which we are unaware, we vacate so much of the order as relates to Hagglof and remand this part of the case so that the trial court may be given an opportunity to exercise its equitable discretion in deciding whether to include or exclude Hagglof.

■ For different reasons we make a similar ruling with respect to Lewis Dillman. We have already held that North American was properly included in that part of the preliminary injunction dealing with Section 5 because it was an "issuer" and through its officers and agents performed numerous acts in respect of the various transfers of the stock. As North American's President, we think Dillman could not properly be eliminated as a non-participant in the scheme, especially as he signed and helped to prepare the Progress Report, which was transmitted through the mails and by means of interstate transportation facilities in the offer and sale of the unregistered North American common stock. Even if he did not directly cause the Progress Report to be transmitted in violation of Sections 5 (a) (1) and 5(c) of the Securities Act, he aided and abetted the furtherance of the unlawful scheme by the major participants. See SEC v. Culpepper, *supra*, 270 F.2d at 246–247; SEC v. Chinese Consolidated Benevolent Association, *supra*, 120 F.2d at 740–741. Therefore, we think it was error to deny relief as to Dillman as matter of law. On the other hand, his position and activities differed markedly from those of the principal participants in the over-all plan. We vacate so much of the order as relates to Dillman's alleged violation of Section 5 and remand so that the trial court may be given the opportunity to exercise its equitable discretion in deciding whether to include or exclude him.

■ Although Alfred Blumberg and Martin Orenzoff were by no means prime movers in the general operation, the findings with respect to them show that their participation in taking "steps necessary to the distribution" was not so slight that it could be described as *de minimis*. Moreover, the reasons for eliminating them were that "they did not receive financial remuneration for their activities," held no office in North American, and "had no financial stake in the distribution of the shares." The court further remarked that their activities were not so essential as to make them underwriters. We hold, however, that no financial stake or motivation is required to support a charge of Section 5 violation. There are many instances in which the primary purpose of the Act —the protection of "those who do not know market conditions from the over-reachings of those who do," Charles Hughes & Co., Inc. v. SEC, 139 F.2d 434, 437 (2d Cir. 1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944)—would be frustrated if only those who stood to gain financially could be prevented from continuing to misinform the public. This statement is equally true with respect to those who assisted the principal wrongdoers out of friendship or other non-pecuniary motives if such persons were held to be beyond the scope of regulation by the courts at the instance of the SEC. See H.R.Rep. No. 152, 73d Cong., 1st Sess. 24 (1933); SEC v. Chinese Consolidated Benevolent Association, *supra*, 120 F.2d at 740–741. These considerations pervade the entire structure of federal securities regulation, an area of the law

expiration of forty days after the first day on which the security was bona fide offered to the public by the issuer or through an underwriter. The District Court found that the stock was first offered in the

United States on June 27, 1967, the day on which trading commenced, and the forty day period would not have ended until August 6, 1967. The SEC stop order took effect on July 20, 1967.

in which it is particularly important to view the statutes not individually but as interdependent components of an integrated regulatory plan. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186–187, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964); United States v. Morgan, 118 F.Supp. 621, 691–692 (S.D.N.Y.1953); 6 L. Loss, Securities Regulation 3915–16 (1969).

Thus the courts have recognized in regard to other securities statutes that the absence of economic motivation is no defense to an action by the SEC to enjoin conduct the continuation of which would lead to improvident decisions by the investing and speculating public on the basis of misleading or incomplete information. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964) (Investment Advisers Act of 1940); SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833 (2d Cir. 1968) (in banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (Securities Exchange Act of 1934). Cf. Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969) (same).

Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10th Cir. 1964), a decision in a private action relied on by the court below, is not to the contrary. The question whether financial motive need be present for the SEC to make out a claim for injunctive relief under Section 5 was not before the *Can-Am* court.

 From the foregoing discussion, it should be apparent that Blumberg and Orenzoff might have been enjoined even if they were found not to be underwriters. Whether their conduct is to be classified as joint participation or aiding and abetting, the statutory language "any person" and our decisions in *Culpepper* and *Chinese Consolidated Benevolent Association* make it clear that being an underwriter is not a prerequisite to a finding of violation of

Section 5. Cf. 1 L. Loss, Securities Regulation 644 (2d ed. 1961).

 Furthermore, most of the activities of Blumberg and Orenzoff consisted of inducing others to purchase or to promote the distribution of unregistered stock. Consequently, these activities are not covered by the exemption contained in Section 4(1) for transactions by persons other than issuers, underwriters and dealers. Orenzoff engaged in no purchases, Blumberg in several, and neither engaged in any sale. The evidence establishes that their transactional activities were of minor consequence, and the court below so treated them.

It is our conclusion that the injunction as to Blumberg and Orenzoff should not have been denied as matter of law. Therefore, we vacate so much of the order as relates to the Section 5 charge against them and remand for further proceedings not inconsistent with this opinion. Thus, by the application of proper legal standards the trial judge will decide: (1) whether the participation of Blumberg and Orenzoff, or either of them, was such as to warrant a finding of violation of Section 5; and, if such violation be found, (2) whether in the exercise of his discretion as an equity judge either or both of these defendants should be included in the restraining provisions of the temporary injunction. There may or may not be any likelihood that they will engage in reprehensible conduct in the future. On the other hand, the Securities Acts and the decisions construing them make it plain that it was the legislative intent to leave as few loopholes as possible.

### B.

### *The Section 10(b) and Rule 10b–5 Violations*

 This phase of the cross-appeal affects only Dillman, Blumberg, and Orenzoff. Faced with the District Court opinions in SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y.1966) and

Heit v. Weitzen, 260 F.Supp. 598 (S.D. N.Y.1966), each of which was later reversed by this Court, SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (in banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), it is easy to see how the interpretation then given to the phrase "in connection with the purchase or sale of any security" led to denial of injunctive relief under Rule 10b–5 against Dillman, Blumberg, and Orenzoff. It is now clear, however, that the activities of these individuals must be held to have occurred "in connection with the purchase and sale of any security." Dillman was the President of North American and a personal friend of White's. Dillman's signature appeared at the end of the Progress Report as President of North American. Indeed, White testified that the Report was prepared by him and Dillman and a man named Stewart "who writes all my reports." All this is enough to establish the Section 10(b) and Rule 10b–5 charge against Dillman if the District Court finds that he did not exercise "due diligence" in ascertaining the accuracy of the information contained in the Progress Report, irrespective of whether he engaged in the sale of any North American shares, intended to effect a distribution of the shares, or had any financial interest as a result of the sale of the shares. Because the District Court made no findings on whether Dillman was diligent in ascertaining that the information he helped to have published was the whole truth and that such diligently obtained information was disseminated in good faith, we vacate that portion of the order which relates to Dillman and remand for further proceedings, so that after applying the proper legal standards, the district judge can exercise his equitable discretion whether to include or exclude him.

■ Blumberg and Orenzoff present more difficult problems because they were not managerial insiders of North American. However, they were not casual tippers either. Although at first blush their position appears analogous to that of the geologist Kenneth H. Darke in *Texas Gulf Sulphur*, further analysis shows that it is considerably different. Darke knew the results of the tests on one of the test holes which strongly suggested the existence of a spectacular ore discovery and told outside tippees that Texas Gulf Sulphur stock was a "good buy." The result was that, having relied on his detailed and accurate inside knowledge, Darke passed the word to his tippees which enabled them to purchase the stock at relatively low prices before the public announcement of the Timmins ore discovery caused a tremendous demand for the shares.

In contrast, this record is unclear about the extent to which Blumberg and Orenzoff, both friends of White, knew the truth about White's scheme and the questionable nature of North American's major operating assets. On this score Orenzoff is in a worse position than Blumberg because he accompanied White at least once to a Beverly Hills brokerage office, and there is testimony which strongly suggests that he visited the Pilot Plant. On such a visit he could not fail to have noticed that the plant was inoperative. In any event, whatever the extent of their information, the effect was that their tippees either purchased or induced others to purchase shares of North American at prices far greater than their actual value; and these persons stood to lose considerable sums.

■ Blumberg was a New York stockbroker who was the "president" of an inactive brokerage firm. He was a friend of White, Freeman, Naft, and one Morris Cooper and received copies of the Progress Report. He recommended the stock to several friends and acquaintances, saying that it was a good stock and would go up. There was evidence that to some of his friends he gave more than merely his opinion that the stock

was a good buy: he spoke vaguely about the "patented" process controlled by North American, and represented that the process would produce pollution-free coke, and that the entire operation would become more feasible because General Electric purportedly was going to construct a plant the nature of which was undisclosed. Moreover, Blumberg admitted that he purchased shares of North American for three discretionary accounts and also secured shares for his mother. At least fifteen investors, including friends to whom he advocated the stock at the Englewood Golf Club in New Jersey, purchased the stock. All purchases were made through Dunhill Securities Corp. and its employees Marvin Osias and Guido Volante. Dunhill acquired the shares from Morris Cooper, his wife, sister, and mother-in-law, all Canadian citizens and friends of White, Freeman, and Naft. Blumberg's promotion of the North American common stock, ostensibly only on the basis of the casual information he obtained from White and Cooper, and without any attempt shown in the record to verify the data he received before passing the tip to outside brokers and speculators, played an important role in furthering the scheme to distribute the shares from the Canadian hands in which they were concentrated to the hands of a more widely dispersed group of Americans.

In Hanly v. SEC, 415 F.2d 589, 595–597 (2d Cir. 1969), this Court enunciated in detail the duties of brokers under Rule 10b–5 in disseminating their opinions about stocks to the public. Although that case concerned review of a disciplinary proceeding against brokers, we think the principles expressed there and in similar cases are equally applicable to SEC injunction proceedings under Rule 10b–5. Accord, SEC v. R. A. Holman & Co., Inc., 366 F.2d 456, 458 (2d Cir. 1966) (under Section 17(a) of the Securities Act of 1933). The "special relationship" between a broker and the public creates an implied warranty that the broker has an adequate and reasonable basis in fact for his opinion, and we hold that the SEC has the power to enforce that warranty against a broker by an injunctive action. The Court in *Hanly* summarized the applicable duties as follows (415 F.2d at 597):

> In summary, the standards by which the actions of each petitioner must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

> A salesman may not rely blindly upon the issuer for information concerning a company, although the degree of independent investigation which must be made by a securities dealer will vary in each case. Securities issued by smaller companies of recent origin obviously require more thorough investigation.

The standards remain the same regardless of the sophistication or knowledge of the customer or tippee; and reliance is immaterial because it is not an element of fraudulent representation under Rule 10b–5 in the context of an SEC proceeding against a broker, whether disciplinary (see *Id.* at 596) or injunctive. For similar expositions of these principles of disclosure, investigation, and fair dealing, see, e. g., Walker v. SEC, 383 F.2d 344 (2d Cir. 1967); Berko v. SEC, 316 F.2d 137 (2d Cir. 1963); Kahn v. SEC, 297 F.2d 112, 115 (2d Cir. 1961) (Clark J., concurring); Charles Hughes & Co., Inc. v. SEC, 139 F.2d 434 (2d Cir. 1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); 3 L. Loss, Securities Regulation 1482–83, 1490 (2d ed. 1961).

The language in Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 543–544 (2d Cir. 1967), referred to by the court below about limiting the scope of Rule 10b–5, was expressed in the context of private actions and thus is distinguishable from the instant case. See Hanly v. SEC, *supra*, 415 F.2d at 596; SEC v. Texas Gulf Sulphur Co., *supra*, 402 F.2d at 863, 868. In view of these principles, it was error for the trial court to deny injunctive relief against Blumberg as matter of law.

Martin Orenzoff, a resident of Los Angeles, touted the stock to several brokers, including Myrna Liebowitz, a registered representative with Coggeshall & Hicks in New York, often using the telephone. He told Miss Liebowitz that he went to Salt Lake City to see the Helper plant and that North American had a patent or a license "for something to extract coke from bituminous coal * * * a way of doing this would be to cut down on air pollution." Also, early in July, 1967, he gave Miss Liebowitz a copy of the Progress Report in the course of an interstate automobile trip. Apparently the copy remained unopened in the back of her car. On the strength of Orenzoff's oral statements about the speculative potential of the stock and the nature of North American's assets, Miss Liebowitz recommended the stock to eight or nine customers, all of whom purchased it. Four transactions by Miss Liebowitz occurred on June 27, 1967, the first day on which the stock was traded in the United States and quotations appeared in the Pink Sheets. She purchased the stock for herself, her sister, over whose account she apparently had discretion, a friend who had set money aside for speculation and to whom she said the stock "might be worthwhile" in the course of a conversation about the stock market, and another friend whose purchase was not solicited.

Orenzoff also was associated with White in his promotion of the stock of North American to brokers in California.

It was he who spoke to one of the salesmen in the Beverly Hills office of Bache & Co., causing Joseph Klein to instruct him to tell the salesman to do nothing about the stock until he heard from Klein.

Howard Alweil testified that on Friday, June 23, 1967, he received a telephone call from an Al Ross who stated that he was given Alweil's name by Orenzoff and would like to come to Alweil's office to see him. Nothing was said about North American common stock at that time. Alweil related this call to Orenzoff either on June 24 or June 25. On June 26, Al and Leonard Ross came to Alweil's office accompanied by Orenzoff; and Leonard Ross returned on June 27, again accompanied by Orenzoff. On both occasions Alweil was told by the Rosses that they were interested in purchasing North American common stock, and sometime during June 27 the Rosses gave Alweil orders, subsequently consummated, to purchase a total of 13,000 shares for themselves, their family, and a few friends. Likewise, a Mr. Sheby was in Alweil's office with Al and Leonard Ross on June 26 and Leonard Ross on June 27 and was introduced to Alweil by Orenzoff. Sheby purchased North American common stock for himself and the accounts of three other persons. Moreover, Orenzoff placed an order (not executed) for 10,000 shares for his employer, a chartist who was reputed to possess considerable wealth. However, neither he nor the other persons whom Orenzoff told about the stock had access to Orenzoff's sources of inside information.

The upshot of this discussion is that by the application of the proper legal standards the trial judge might have: (1) found Blumberg and Orenzoff, or either of them, guilty of violations of Section 10(b) and Rule 10b–5; and (2) exercised his equitable discretion in favor of including them in this phase of the preliminary injunction. The difficulty, as we see it, is that the proper legal standards were not applied and the

trial judge never reached the point of exercising any discretion at all.

We vacate that part of the order which denies a preliminary injunction against Blumberg and Orenzoff for violating Section 10(b) and Rule 10b–5 and remand to the court below for further proceedings which, just as in the case of the Section 5 violations, will enable the court to exercise its equitable powers in a just and reasonable manner, consistent with the facts developed and to be developed in the record with respect to these appellees.

Affirmed as to North American Research and Development Corporation, Edward White, and K. Ralph Bowman; vacated and remanded for further proceedings not inconsistent with this opinion as to Lewis Dillman, Alfred Blumberg, Martin Orenzoff, and Lars Hagglof & Co., Ltd.